COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | |
| EMERITUS CORPORATION, | | No. 08-09-00007-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | County Court at Law No. 5 |
| | § | |
| LILLIAN BLANCO, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 2007-2865) |
| | § | |

**O P I N I O N**

We decide today that an employee may pursue a private cause of action for retaliatory discharge against an assisted living facility. Emeritus Corporation appeals from a judgment in excess of $134,000 plus post-judgment interest in favor of former employee, Lillian Blanco. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

Emeritus Corporation owns and operates over four hundred assisted living facilities throughout the United States, including four properties in El Paso. Lillian Blanco began working for Emeritus in July 2006, at the company's El Paso facility known as The Palisades. In September, she was promoted to Interim Executive Director and transferred to the company's Cambria facility. Cambria is composed of two separate units. Residents in the assisted living unit had very few restrictions on movement within and outside the facility. The Special Care or Memory Alzheimer's Unit is monitored and secured for patient safety. The residents in the Special Care Unit required significantly more medical attention and daily care than the assisted living unit residents. Up to eighty residents lived at the Cambria facility.

At the time Blanco arrived at the facility, Cambria had been under continual review by the Texas Department of Aging and Disability Services for several months. In September, the Department notified Emeritus of its intention to deny the application for renewal of Cambria's operating license due to the number of regulatory violations. The recorded violations included documentation and reporting errors, issues with medication, and problems between patients in the Alzheimer's Unit. During Blanco's initial three months at Cambria, Emeritus sent medical and administrative support staff to assist with the implementation of the Plan of Correction developed by Blanco and the company's Director of Clinical Services, Patsy Grider.

Cambria's licensing problems continued through the months of September and October. On November 9, 2006, Emeritus received notice from the Department indicating that it still intended to deny renewal despite additional documentation and evidence regarding operations. Emeritus subsequently was granted an informal reconsideration of the application. Once again, the Department refused to alter its decision. Finally, on November 22, 2006, Department inspectors conducted a follow-up on-site review and noted that the facility had achieved substantial compliance. Emeritus received official notice of the Department's decision to grant Cambria's renewal application on January 19, 2007.

Following the November inspection and determination that Cambria was in substantial compliance with state regulations, Emeritus began withdrawing resources which had been available to Blanco during Cambria's licensing difficulties. On November 30, 2006, Blanco received an e-mail from Deborah Montgomery, Regional Director of Quality Services assigned to the El Paso facilities, indicating that Cambria was over-budget and instructing Blanco to reduce staff hours by thirty hours per day. Staff reduction was primarily to be implemented by reducing the hours worked by the facility's registered nurses, certified nursing assistants, and medical technicians. According

to Blanco, the reduction meant that Cambria did not have an adequate number of staff members at the facility at a given time to provide for the needs of the residents in both units. Staff worked in three shifts: 7 a.m. to 3 p.m., 3 p.m. to 11 p.m., and 11 p.m. to 7 a.m. After the schedule reduction, Cambria's 11 p.m. to 7 a.m. shift, the night shift, was reduced to two staff members. One staff member was dedicated to each unit during a shift. In addition to patient care, the night staffers had additional duties including vacuuming, preparing the dining room for breakfast, and patient laundry in the assisted living unit, while the Special Care Unit staffers also changed linens as needed and bathed residents according to a facility schedule. The medical technician, who was responsible for dispersing medication, did not work the night shift. When a patient needed medication or medical attention during the night shift, Blanco was forced to call an off-duty medical technician or have the patient transported to the emergency room. When the night shift staff complained about being overloaded during their shifts, Blanco voiced concerns to other Emeritus administrators. She was told that the facility had to stay within the allotted budget. To compensate, employees were asked to extend their shifts by starting early or staying late to create a shift overlap.

Blanco also had problems maintaining Cambria's nursing staff. The staff nurse at the time Blanco arrived at the facility asked to have her duties cut to those of a medical technician because of the amount of work required. The next nurse to come on staff resigned after approximately two months. In December, Emeritus assigned another nurse but after several patient mix-ups and her inability to keep patient records current, she also left the facility. The next nurse resigned due to work overload. When Blanco found yet another replacement, Emeritus immediately transferred the new-hire to another El Paso facility. According to Blanco, Emeritus moved employees through Cambria on a regular basis. Employees would work at the facility for short periods of time, and then be transferred to one of the company's other facilities, sometimes leaving Cambria without a nurse

on staff.

During one of the periods when the facility was without a staff nurse, Blanco was called to an Alzheimer patient's room in the Special Care Unit, where the patient was lying in bed with a "mass" protruding from her body. Blanco called a nurse from another Emeritus facility who checked the patient and told Blanco that the mass was a prolapsed uterus. The patient suffered from multiple issues while waiting for surgery. Without a nurse at the facility, Blanco personally assumed the coordination of the woman's medical care. When Blanco's reported this and other incidents to company administrators, Emeritus did not provide additional support. In January 2007, in the midst of the facilities staffing problems, Emeritus formally reprimanded Blanco, claiming that Cambria had fallen behind on billing. Blanco attributed this reprimand and subsequent negative feedback to ongoing disputes with her supervisors over staff and hours.

Blanco became ill in early March. She suffered sleep disruptions and migraine headaches. Her doctor diagnosed her with shingles, and ordered her off work from March 8 to March 13. She faxed her doctor's explanation to her supervisor immediately. After three fax attempts, which her supervisor denied receiving, a friend hand delivered the note. Blanco felt that she was singled out by Emeritus administrators, and explained that executive directors at other facilities were not held to the same standards when they needed time off due to illness. In addition, although executive directors at other facilities were generally provided with alternate staff to cover their absences, Blanco had difficulty finding other Emeritus employees to fill in during her absence.

On March 13, 2007, Blanco notified Emeritus of her intent to resign her position effective April 3, 2007. Cindy Gunderson, Human Resources Director accepted the resignation on March 27. On March 26, Blanco sent the following email to seven other Emeritus employees and supervisors:

I feel that I need to address my concerns and issues regarding Cambria Assisted

Living Community.

.     .     .

Because of the lack of staff and inadequate training I believe that our residents are not receiving the proper care they deserve. After voicing my concerns I feel corporate management has ignored my concerns and has placed me in a situation I can no longer accept or tolerate. As I am not a nurse I feel I am not qualified to make certain decision[s] regarding the residents medical care, nor do I feel qualified to be responsible for checking medical records that effect the residents day to day care. Since we don't have [a staff nurse] on board it makes it extremely difficult to properly address and run the day to day issues in this facility. Since September 29, 2006 when I was assigned to this facility we have had [five] nurses, [two] of which have left their employment for what they stated was too much work and not enough time for them to perform the duties assigned. The nurse currently on board is working under extreme pressure and is unable to complete all duties required to properly care [for] the residents in the Assisted Living and Special Care Unit. We have had **several** medical situation[s] and occurrences that have transpired in the short time I have been [Executive Director] and I believe that much of this is attributed to lack of staff and especially to their lack of training. I believe this will continue to happen if the staff continues working under the circumstance they are currently facing. It is to the point that I feel that I need to document to you once again the lack of proper resident care being provided as required by State regulations and as promised to the residents families.

Since my assignment to the position I don't feel that I have received the necessary operational, administrative or medical training necessary to properly run this facility. I have repeatedly voiced my concerns and have advised upper management of my need for training. I have contacted you in the past, and assumed that the situation would be corrected, but feel that following that call I have been faced with retaliation. I have been belittled and addressed in a very condescending manner by Vicki Allen on more than one occasion.

On March 9th I contacted Cindy Gunderson -- HR Central Division to discuss an issue I had had with Vicki regarding my sick time off, and in her absence spoke to Stacey Yann who stated that she would get back with me on my situation, I have yet to hear from Stacey. I also called Chris Belford and left a phone message asking him to contact me and never heard from him either. I do not feel that I have been provided the necessary support to be able to fulfill the job requirements and adequately provide the necessary care to the resident in this community.

**As a result of the lack of staff and proper training it is affecting the overall health and welfare of the residents, medications are not being properly documented or dispensed, proper medical attention is not being provided and addressed, documentation to the residents charts is not being properly charted,**

**communication to the doctors is not up to date, therefore placing the residents health at risk. Because we only have one nurse in the facility it is difficult to get all the residents medical needs properly met and the shortage of staff makes [it] difficult to give the individual care needed to the residents.** [Emphasis in original].

I request that you immediately address these concerns to ensure the safety and well being of the residents.

Blanco filed suit on June 18, 2007. She alleged that her employer's refusal to address the staffing and patient care issues she identified during her time at Cambria, in addition to the treatment she received from her immediate supervisors constituted a constructive termination, prohibited under Texas Health and Safety Code Section 247.068. The case was tried to a jury in July 2008. The charge inquired:

QUESTION NUMBER ONE: Did EMERITUS CORPORATION discharge LILLIAN BLANCO because she filed a complaint, presented a grievance, or in good faith provided information relating to personal care services provided by EMERITUS CORPORATION?

An employee is considered to have been discharged when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.

An employer does not discharge an employee for filing a complaint, presenting a grievance, or in good faith providing information relating to personal care services, if the employer would have made the same decision when it did even if the employee had not submitted such complaint, grievance or information.

ANSWER 'YES' OR 'NO.'

ANSWER: Yes.

The jury awarded Ms. Blanco $128,500 in damages for lost wages and mental anguish. The trial court entered judgment on the jury's verdict, and added an award for post-judgment interest. Emeritus appeals, and presents three issues for review. In Issue One, it contends the judgment must be reversed because Blanco's alleged statutory basis for liability was not intended to provide a

private cause of action. In Issues Two and Three, Emeritus contends that the evidence is legally insufficient to support the jury's determination that Blanco was constructively discharged, or that she was retaliated against.

## PRIVATE CAUSE OF ACTION?

In Issue One, Emeritus argues that the provisions of the Assisted Living Facility Licensing Act do not create a private cause of action for an aggrieved employee. TEX.HEALTH & SAFETY CODE ANN. § 247.068. This is a question of statutory construction, which we review *de novo*. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003). Our primary objective in construing any statute is to determine the Legislature's intent in enacting the particular provision, and to give that provision its intended effect. *Ramirez*, 109 S.W.3d at 745. We must interpret the statute according to the plain meaning of the language used, and must read the statute as a whole without giving effect to certain provisions at the expense of others. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). Each word, phrase, or expression must be read as if it were deliberately chosen, and we will presume that words excluded from a provision were excluded purposefully. *Gables Realty Ltd. Partnership v. Travis Central Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex.App.--Austin 2002, pet. denied).

Section 247.068 provides:

(a) A person licensed under this chapter may not retaliate against a person for filing a complaint, presenting a grievance, or providing in good faith information relating to personal care services provided by the license holder.

(b) This section does not prohibit a license holder from terminating an employee for a reason other than retaliation.

TEX.HEALTH & SAFETY CODE ANN. § 247.068 (West 2010). The question presented is whether this provision was intended to create a private cause of action upon which an aggrieved employee can

personally sue an offending employer, or whether the Legislature intended only to provide the Department with the authority to penalize facilities for retaliatory actions.  We begin our analysis with other subchapters of the Health and Safety Code.  Legislation relating to the creation and administration of health facilities in Texas is compiled in Title IV of the Code.

<u>**Convalescent and Nursing Homes**</u>

Chapter 242 relates to convalescent and nursing homes.  Section 242.133 provides in pertinent part:

**§ 242.133.  Retaliation Against Employees Prohibited**

.     .     .

(b) An employee has a cause of action against an institution, or the owner or another employee of the institution, that suspends or terminates the employment of the person or otherwise disciplines or discriminates or retaliates against the employee for reporting to the employee's supervisor, an administrator of the institution, a state regulatory agency, or a law enforcement agency a violation of law, including a violation of this chapter or a rule adopted under this chapter, or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the institution.

(c) The petitioner may recover:

(1) the greater of $1,000 or actual damages, including damages for mental anguish even if an injury other than mental anguish is not shown and damages for lost wages if the petitioner's employment was suspended or terminated;

(2) exemplary damages;

(3) court costs; and

(4) reasonable attorney's fees.

(d) In addition to the amounts that may be recovered under Subsection (c), a person whose employment is suspended or terminated is entitled to appropriate injunctive relief, including, if applicable:

(1) reinstatement in the person's former position; and

(2) reinstatement of lost fringe benefits or seniority rights.

TEX.HEALTH & SAFETY CODE ANN. § 242.133 (b)-(d). Subsection (e) provides the requisite statute of limitations. Subsection (f) places the burden of proof on the petitioner, but imposes a rebuttable presumption that the person's employment was suspended or terminated for reporting abuse or neglect if the person is suspended or terminated within sixty days after the date the person reported in good faith. Subsection (g) then establishes three alternative venues. Clearly, the Legislature manifested its intention to provide a private cause of action for violations of Chapter 242.

### Intermediate Care Facilities for the Mentally Retarded

Chapter 252 addresses intermediate care facilities for the mentally retarded. Section 252.132 speaks to retaliation against an employee and virtually mirrors the language of Chapter 242 with regard to a private cause of action, venue, statutes of limitation, and recoverable damages. TEX.HEALTH & SAFETY CODE ANN. § 252.132.

### Mandatory Overtime for Nurses

Chapter 258 prohibits mandatory overtime for nurses. Section 258.005 further prohibits a hospital from suspending, terminating, disciplining, or discriminating against a nurse who refuses to work mandatory overtime. TEX.HEALTH & SAFETY CODE ANN. § 258.005 (West 2010). It contains no reference to administrative penalties or a private cause of action.

### Restraints and Seclusion

Chapter 322 prohibits certain restraints against a resident of a facility. Section 322.054 provides that a facility may not discharge or otherwise retaliate against an employee because the employee files a complaint, presents a grievance, or otherwise provides in good faith information relating to the misuse of restraints or seclusion at the facility. TEX.HEALTH & SAFETY CODE ANN. § 322.054. Subsection (b) allows a licensing agency to (1) revoke, suspend, or refuse to renew the

license, registration, or certification of a facility that violates this provision, or (2) place a facility in violation on probation. The statute provides no remedy other than administrative penalties.

## Ambulatory Surgical Centers

Chapter 243 relates to ambulatory surgical centers. While it outlines provisions for licensing and penalties, it contains no retaliatory prohibition. The same is true for Chapters 244 (Birthing Centers), 245 (Abortion Facilities), 246 (Continuing Care Facilities), 248 (Special Care Facilities), 249 (Maternity Homes), 251 (End Stage Renal Disease Facilities), and 254 (Freestanding Emergency Medical Care Facilities).

## Recapitulation

The Health and Safety Code thus contains two chapters that affirmatively create a private cause of action and provide specific details as to venue, damages, limitations, and burdens of proof. One chapter prohibits retaliation but provides no recourse except administrative penalties. One statute prohibits retaliation, but provides neither an administrative penalty nor a private cause of action. Eight chapters outline provisions for licensing and penalties, but contain no retaliatory prohibition. We turn now to Chapter 247.

## Assisted Living Facilities

We have already restated the retaliatory provisions of this statute. Subchapter C provides for general enforcement. Various sections within this subchapter specify remedies, including:

§ 247.041 -- Denial, Suspension, or Revocation of License

§ 247.042 -- Emergency Suspension or Closing Order

§ 247.043 -- Investigation of Abuse, Exploitation, or Neglect

§ 247.044 -- Injunction

§ 247.045 -- Civil Penalties

§ 247.0451 -- Administrative Penalty

Subchapter D contains the retaliation provision, the Residents' Bill of Rights (Section 247.064), and the Provider's Bill of Rights (Section 247.065). Blanco suggests that these provisions, not found elsewhere in the Code, indicate an intent to create a private cause of action.

All assisted living facilities are required to post a copy of the Residents' Bill of Rights in a prominent place in the facility. TEX.HEALTH & SAFETY CODE ANN. § 247.064(b). The Bill of Rights must inform the residents of their right to:

(1) manage the resident's financial affairs;

(2) determine the resident's dress, hair style, or other personal effects according to individual preference, except that the resident has the responsibility to maintain personal hygiene;

(3) retain and use personal property in the resident's immediate living quarters and to have an individual locked cabinet in which to keep personal property;

(4) receive and send unopened mail;

(5) unaccompanied access to a telephone at a reasonable hour or in case of an emergency or personal crisis;

(6) privacy;

(7) unrestricted communication, including personal visitation with any person of the resident's choice, at any reasonable hour, including family members and representatives of advocacy groups and community service organizations;

(8) make contacts with the community and to achieve the highest level of independence, autonomy, and interaction with the community of which the resident is capable;

**(9) present grievances on behalf of the resident or others to the operator, state agencies, or other persons without threat of reprisal in any manner;**

(10) a safe and decent living environment considerate and respectful care that recognizes the dignity and individuality of the resident;

(11) refuse to perform services for the facility, except as contracted for by the resident and operator;

(12) practice the religion of the resident's choice;

(13) leave the facility temporarily or permanently, subject to contractual or financial obligations; and

(14) not be deprived of any constitutional, civil, or legal right solely by reason of residence in an assisted living facility.

[Emphasis added].  TEX.HEALTH & SAFETY CODE ANN. § 247.064(b).  None of these provisions

provides a right or remedy to an employee.

Similarly, Section 247.065 contains the "Providers' Bill of Rights," which specifies that a

"provider of personal care services" has the right to:

(1) be shown consideration and respect that recognizes the dignity and individuality of the provider and assisted living facility;

(2) terminate a resident's contract for just cause after a written 30-day notice;

(3) terminate a contract immediately, after notice to the department, if the provider finds that a resident creates a serious or immediate threat to the health, safety, or welfare of other residents of the assisted living facility;

**(4) present grievances, file complaints, or provide information to state agencies or other persons without threat of reprisal or retaliation;**

(5) refuse to perform services for the resident or the resident's family other than those contracted for by the resident and the provider;

(6) contact with the community to achieve the highest level of independence, autonomy, interaction, and services to residents;

(7) access to patient information concerning a client referred to the facility, which must remain confidential as provided by law;

(8) refuse a person referred to the facility if the referral is inappropriate;

(9) maintain an environment free of weapons and drugs; and

(10) be made aware of a resident's problems, including self-abuse, violent behavior, alcoholism, or drug abuse.

[Emphasis added].  TEX.HEALTH & SAFETY CODE ANN. § 247.065(b).  Only paragraph (8) of the

Residents' Bill of Rights and paragraph (4) of the Provider's Bill of Rights [the right to present grievances, file complaints, or provide information to state agencies or other persons without threat of reprisal or retaliation] have a potential bearing on our analysis. Because these provisions offer no remedy for the prohibited retaliation, we must still look to Subchapter C which addresses statutory enforcement.

Blanco maintains that the language in Section 247.049, which is contained within Subchapter C, has no meaning unless a private cause of action was intended.

### § 247.049. Use of Regulatory Reports and Documents

(a) Except as otherwise provided by this section, a report or other document prepared by the department that relates to regulation of an assisted living facility is not admissible as evidence in a civil action to prove that the facility violated a standard prescribed under this chapter.

(b) Subsection (a) does not:

> (1) bar the admission into evidence of department reports or other documents in an enforcement action in which the state or an agency or political subdivision of the state is a party, including:

>> (A) an action seeking injunctive relief under Section 247.044;

>> (B) an action seeking imposition of a civil penalty under Section 247.045;

>> (c) a contested case hearing involving denial, suspension, or revocation of a license issued under this chapter; and

>> (D) an action seeking imposition of an administrative penalty under this subchapter;

> (2) bar the admission into evidence of department reports or other documents that are offered:

>> (A) to establish warning or notice to an assisted living facility of a relevant department determination; or

>> (B) under any rule or evidentiary predicate of the Texas Rules

of Evidence;

(3) prohibit of limit the testimony of a department employee, in accordance with the Texas Rules of Evidence, as to observations, factual findings, conclusions, or determinations that an assisted living facility violated a standard prescribed under this chapter if the observations, factual findings, conclusions, or determinations were made in the discharge of the employee's official duties for the department; or

(4) prohibit or limit the use of department reports or other documents in depositions or other forms of discovery conducted in connection with a civil action if use of the reports or other documents appears reasonably calculated to lead to the discovery of admissible evidence.

TEX.HEALTH & SAFETY CODE ANN. § 247.049.

The question, then, is whether the enforcement subchapter contemplates a remedy that may be pursued when "the state or an agency or political subdivision of the state" is not a party. It does not. For that reason, Section 247.049(a) appears to be meaningless. This begs the question whether Subsection (a) authorizes a civil action by a resident or an employee against an assisted living facility for violations of Chapter 247. Emeritus has not directly responded to this question. It tells us, however, that the Legislature gave the Department the duty to impose "prompt and effective remedies for violations of this chapter and rules and standards adopted under this chapter." *See* TEX.HEALTH & SAFETY CODE ANN. § 247.0011(b)(6). Its brief goes so far as to suggest that, "as a matter of law *only* the [Department] is authorized to redress complaints . . . ." But Section 247.049 bars admission of a Department report or document in all civil cases **except** those in which the state or an agency or political subdivision of the state is a party. So what are "all" of those "civil cases"? But for Section 247.049(a), we would wholeheartedly agree with Emeritus. Yet the Code Construction Act informs us that we should not construe a statute so as to render the law absurd or meaningless. As Justice Willett has recently articulated:

The meaning of a statute is a legal question, which we review de novo to ascertain and give effect to the Legislature's intent. *F.F.P. Operating Partners., L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). Where text is clear, text is determinative of that intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)('[W]hen possible, we discern [legislative intent] from the plain meaning of the words chosen.'); *see also Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006). **This general rule applies unless enforcing the plain language of the statute as written would produce absurd results**. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). Therefore, our practice when construing a statute is to recognize that 'the words [the Legislature] chooses should be the surest guide to legislative intent.' *Fitzgerald v. Advanced Spine Fixation Sys., Inc*., 996 S.W.2d 864, 866 (Tex. 1999). Only when those words are ambiguous do we "resort to rules of construction or extrinsic aids." *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007). [Emphasis added].

*Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)(Willett, J., concurring).

We thus conclude that a statute imposing evidentiary rules in civil cases in which the Department is **not** a party has no meaning whatsoever if **only** the Department can enforce the statute. We overrule Issue One.

## SUFFICIENCY OF THE EVIDENCE

In Issues Two and Three, Emeritus argues that the evidence is legally insufficient to support the jury's determination that Blanco was constructively discharged, or that she was retaliated against by her employer.

### Standard of Review

A legal sufficiency challenge will be sustained when the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When conducting a legal sufficiency review, we "must view the evidence in the light favorable to the verdict, crediting favorable evidence if

reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Wilson*, 168 S.W.3d at 830. The jury remains the sole judge of witness credibility and the weight to be attributed to testimony. *Wilson*, 168 S.W.3d at 819-20. We must also show deference to the jury's resolution of conflicts in the evidence and presume that the jury resolved all conflicts in accordance with the verdict rendered. *See id.* at 820-21. The ultimate test for legal sufficiency is whether the evidence would enable reasonable and fair-minded persons to reach the verdict under review. *Id.* at 827. Where, as here, there is no objection by the defendant to the submission and instructions, the reviewing court measures the sufficiency of the evidence by the charge as it was submitted to the jury. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

## Constructive Discharge

A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *See Baylor University v. Coley*, 221 S.W.3d 599, 604-05 (Tex. 2007), *citing Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 2351, 159 L.Ed.2d 204 (2004); *Hammond v. Katy Independent School District*, 821 S.W.2d 174, 177 (Tex.App.--Houston [14th Dist.] 1991, no writ). Many factors are relevant to the issue, including evidence of badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation. *Davis v. City of Grapevine*, 188 S.W.3d 748, 766 (Tex.App.--Fort Worth 2006, pet. denied).

We have already detailed the onerous working conditions once Blanco successfully brought Cambria into compliance with state regulations. The record includes evidence of Blanco's repeated requests for additional staff and staff hours, her concerns regarding the impact Cambria's nursing turnover had on patient care, and the effect the stress of her job had on her personal health. The record also includes documentation of Emeritus' failure to respond to Blanco's concerns, following

the Department's decision to renew the facility's application for an operational license. Her email to supervisory staff nicely summarizes the situation:

> As a result of the lack of staff and proper training it is affecting the overall health and welfare of the residents, medications are not being properly documented or dispensed, proper medical attention is not being provided and addressed, documentation to the residents charts is not being properly charted, communication to the doctors is not up to date, therefore placing the residents health at risk. Because we only have one nurse in the facility it is difficult to get all the residents medical needs properly met and the shortage of staff makes [it] difficult to give the individual care needed to the residents.

From this, inferences may be drawn that Blanco could not continue to watch patient care deteriorate. Because this evidence rises to a level which would allow reasonable and fair-minded persons to differ in their conclusions, and because we may not interfere with the jury's resolution of conflicts in the evidence, and the weight attributed to witness testimony, we conclude the evidence is legally sufficient to support the jury's verdict regarding constructive discharge. Issue Two is overruled.

Having concluded that the jury's determination of constructive discharge in violation of Section 247.068 is supported by legally sufficient evidence, we need not address Emeritus' contention that the evidence was legally insufficient to support the jury's implicit determination that Blanco was the subject of retaliation. We overrule Issue Three and affirm the trial court's judgment.

July 6, 2011

               ANN CRAWFORD McCLURE, Justice

Before McClure, J., Rivera, J., and Barajas, C.J. (Ret.)
Barajas, C.J. (Ret.), sitting by assignment