COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| ROBERTO DIAZ, | § | No. 08-15-00358-CV |
| | § | |
| Appellant, | § | Appeal from |
| | § | |
| v. | § | County Court at Law No. 6 |
| | § | |
| R & A CONSULTANTS, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC # 2015-DCV-3097) |
| | § | |

## **O P I N I O N**

In this construction accident case, we must principally decide if one contractor owed a duty to another contractor's employees. Aside from the parties' conduct and contracts which usually resolve this question, we also consider the duty implications of administrative regulations applicable to the type of construction at issue here: asbestos abatement. The trial court granted summary judgment in favor of the defendant contractor. We agree and affirm.

## **BACKGROUND**

Roberto Diaz worked for Robles and Sons, Inc. (Robles), an asbestos abatement contractor. Robles was abating asbestos containing joint compound on the walls and ceiling of a commercial retail space. At the time of the accident, Diaz was working inside a "containment area" which enclosed a space with plastic sheeting, and through negative air pressure, prevented the escape of

any free-floating asbestos particles. *See* 25 TEX.ADMIN.CODE § 295.32 (31)(Tex.Dep't of State Health Serv., Definitions). Within that zone, Diaz was cleaning dust and debris between a false ceiling and the actual roof of the structure. A person, unidentified in this record, called up to Diaz and threw him material to fix a tear in the containment area's plastic sheeting. To reach the tear, Diaz had to unhook his fall protection harness. When he did so, and as he walked over the false ceiling, it gave way and he fell some seventeen feet, causing serious injuries.

Diaz sued the premises owner, Simon Properties. He also sued R&A Consultants, Inc. (R&A) who had contracted with Simon Properties to provide "project design" and "air monitoring" services for the abatement project. Diaz' suit alleged three theories against R&A: negligence, premises liability, and joint enterprise. R&A moved for summary judgment challenging multiple elements of each claim. Relevant to this appeal, R&A claimed that it owed no duty to Diaz, who was the employee of an independent contractor. The trial court granted the motion and severed Diaz's claims against R&A. In this appeal, Diaz challenges only the summary judgment on the negligence claim.

**STANDARD OF REVIEW**

We review a trial court's decision to grant summary judgment *de novo. Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). R&A filed a hybrid motion that included both traditional and no-evidence grounds. The trial court granted both motions without specifying the grounds. Diaz thus carries the burden of negating all possible grounds upon which the summary judgment could have been granted. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995); *Ramirez v. First Liberty Ins. Corp.*, 458 S.W.3d 568, 571 (Tex.App.--El Paso 2014, no pet.).

2

A "no evidence" motion requires the moving party to "state the elements as to which there is no evidence," and upon doing so, the burden shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged in the motion. TEX.R.CIV.P. 166a(i); *see also Wade Oil & Gas, Inc. v. Telesis Operating Company, Inc.*, 417 S.W.3d 531, 540 (Tex.App.--El Paso 2013, no pet.). In a traditional motion for summary judgment, the movant carries the burden to show there is no genuine issue of material fact on a claim or defense, and that the movant is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c). Once the movant establishes a right to judgment as a matter of law, the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979). A defendant is entitled to summary judgment if it conclusively negates at least one element of the plaintiff's claim, or conclusively establishes an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

For both types of motions, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002). The non-movant establishes a genuine issue of material fact by producing more than a scintilla of evidence regarding the challenged element. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *Id.* The non-movant fails in their burden when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas*, 417 S.W.3d at 540.

**DUTY**

A valid negligence claim requires the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). While R&A challenged each element of Diaz's claim below, the parties principally join issue on whether R&A owed a duty to Diaz. Whether one party owes a duty to another is a question of law that we decide from the facts surrounding the occurrence at issue. *Golden Spread Council, Inc. No. 562 of the Boy Scouts of America v. Akins*, 926 S.W.2d 287, 289-90 (Tex. 1996)(noting that courts must "weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.").

Diaz asserts in part that the duty in this case is governed by those cases defining a general contractor's duty to a subcontractor's employees. That same body of law treats a general contractor as the "owner or occupier of land," thus creating an overlap with a premises owner's duty to a business invitee on the property. *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997)(discussing the "hybrid body of law that lies at the intersection" of a general contractor and premises' owner duty question). As an owner or occupier of the land, R&A might owe one of two duties related to either (1) defects existing on the premises when the independent contractor entered and (2) defects the independent contractor created by its work activity. *Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 225 (Tex. 1999). As Diaz has not specifically challenged the summary judgment on his "premises liability" count, we focus on the second category--a premises danger created by Robles's work activity.[1]

---

[1] The parties have not raised, and we do not address whether Diaz's fall through the false ceiling exclusively raised a premise defect claim. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017)(discussing distinction between negligent activity and premises defect claims); *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 215 (Tex.

4

A general contractor does not owe a duty to ensure that an independent contractor performs its work in a safe manner. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001), *citing Elliott-Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) and *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998). There are several exceptions to this rule, and an important one here: when a general contractor retains some control over how the independent contractor performs its work, the general contractor must exercise that control in a reasonable manner. *Elliott-Williams*, 9 S.W.3d at 803; *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985), *citing* RESTATEMENT (SECOND) OF TORTS § 414 (1965)("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.").

The Restatement Section 414 "control" exception itself, and subsequent Texas Supreme Court decisions, recognize several meaningful limitations on the duty. As the Restatement requires, "[t]he employer's role must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Redinger*, 689 S.W.2d at 418, *citing* RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965). "[M]erely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999), *citing* RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965). Rather, there must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. *Id*.

---

2015)(discussion of whether absence of necessary instrumentalities to avoid a fall stated a negligence or premises defect claim).

Next, courts have required a nexus between the control and the injury-producing event. *Mendez*, 967 S.W.2d at 357 (requiring "*nexus* between an employer's retained supervisory control and the condition or activity that caused the injury")[Emphasis in original]; *Painter v. Sandridge Energy, Inc.*, 511 S.W.3d 713, 720 (Tex.App.--El Paso 2015, pet. denied)(collecting cases and noting "the right to control must extend to the specific activity from which the injury arose."). State otherwise, the control must relate to the injury producing event. *Olivo*, 952 S.W.2d at 528 ("For the general contractor to be liable for negligence, its supervisory control must relate to the condition or activity that caused the injury.").

Litigants sometimes attempt to find that nexus in a general contractor's policies that require compliance with its own safety rules or governmental safety rules. The Texas Supreme Court, however, has described this as a "narrow" duty of care that any safety requirements and procedures do not unreasonably increase the probability and severity of injury. *Mendez*, 967 S.W.2d at 358. Additionally, a general contractor who is "aware that its contractor routinely ignores applicable federal guidelines and standard company policies related to safety may owe a duty to require corrective measures to be taken or to cancel the contract." *Mendez,* 967 S.W.2d at 357. The supreme court has also imposed a duty on a general contractor who has actual knowledge of a critical breach of a specific safety procedure and who had a contractual right to stop the work for such a breach. *Lee Lewis*, 70 S.W.3d at 783 (knowledge of deficient fall-prevention practices along with the right to stop work); *Tovar v. Amarillo Oil Co.,* 692 S.W.2d 469 (Tex. 1985) (knowledge of improper set up of blow-out preventer, along with the contractual right to stop work).

Traditionally, a party can prove the right to control in two ways: (1) by evidence of a contractual agreement that explicitly assigns a right to control or (2) in the absence of such a

6

contractual agreement, by evidence of the actual exercise of control. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605-06 (Tex. 2002); *Koch*, 11 S.W.3d at 155. Diaz also argues there is a third way of establishing liability: a duty may be imposed by a statute or administrative regulation placing a safety obligation on a particular party. Section 424 of the RESTATEMENT (SECOND) OF TORTS (1965) provides:

> One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.

A comment to section 424 further explains that a duty to take safety precautions cannot be delegated to an independent contractor:

> The rule stated in this Section applies whenever a statute or an administrative regulation imposes a duty upon one doing particular work to provide safeguards or precautions for the safety of others. In such a case the employer cannot delegate his duty to provide such safeguards or precautions to an independent contractor.

*Id.* at comment a. The Texas Supreme Court applied Section 424 in *MBank El Paso, N.A. v. Sanchez*, and imposed a duty on a secured creditor to take precautions for public safety when pursuing nonjudicial repossession. 836 S.W.2d 151, 153 (Tex. 1992). The duty arose from a Uniform Commercial Code provision allowing creditors to repossess collateral, but only if they could do so without a breach of the peace. *Id*. at 152. As we discuss below, Diaz contends that several administrative regulations that govern asbestos abatement impose a Section 424 duty on R&A.

R&A does not consider itself either the property owner or a general contractor for duty purposes. It tacitly agrees, however, that its duty turns on whether it actually controlled, or had the right to control fall protection on the worksite (by contract or regulatory directive).

**DISCUSSION**

7

Applying these principles, we address whether Diaz raised a duty based on some right of control through either the parties' contracts, any actual control exercised at the worksite, or as a matter of law through statute or administrative code. But because the control must relate to the injury causing event, we first describe the accident in more depth.

**The Accident**

Diaz's third amended petition contains forty-six alternate theories of negligence. The allegations, along with the evidence submitted in response to the summary judgment, in substance claim that the accident occurred because of the fall prevention system Diaz was using. Diaz and a co-worker were cleaning dust and debris from the topside of a false ceiling in the space being abated. When they had to move around, they would walk on the top of the metal studs that formed interior walls to the space. Because much of the ceiling was still in place, and the all the light sources were below the ceiling, the area where they were working was dark such that Diaz could not always see where he was stepping.

Diaz was working inside a containment zone that his employer had set up with plastic sheeting. Just before the fall, Diaz was instructed to repair an opening in the plastic sheeting. He was called to come over and pick up materials to fix the breach. Diaz did not know who directed him to do so. His co-worker, Benito Adame, testified that it was a Robles leadman.

Diaz wore a harness with a lanyard that he could attach to anchors while working at height. His harness, however, only had one lanyard so that if he needed to move between areas protected by different anchors, he would need to unhook from one anchor and attach it to the next. With only one lanyard, however, he would be unprotected while transferring between anchors. Also, on this job the workers used the existing structures of the building--such as roof trusses--as

anchors. On other jobs, a cable had been placed for the express purpose of providing ready anchor point.

Diaz was able to climb to the level of the false ceiling on scaffolding that Robles had assembled. To reach the tear in the plastic, Diaz could not use the scaffolding, and needed to attach his lanyard to a different anchor. While moving between anchor points, he walked on the top of the false ceiling that gave way. Accordingly, some evidence in our record shows that the fault was either with not having two lanyards that could be used in tandem, or the failure to place a cable for better anchorage. The situation was exacerbated by the poor lighting, or a lack of scaffolding that would fit into the area at issue.

### Duty under the Texas Administrative Code

The property owner, Simon Properties, put out two requests for proposal--one for an abatement contractor, and one for a consultant. The scope of work for the consultant included air monitoring, project design, and project management. Simon Properties hired R&A as the consultant, and R&A prepared the project design. The project design is a multi-page document that contains all the specifications that the asbestos abatement contractor--here Robles--was expected to meet. The design document also describes some specific methods to accomplish the work, such as instructions on wetting surfaces before they are cut or disturbed. R&A as the consultant agency may employ a project manager and according to some evidence in our record, did so here. R&A was also expected to do the air monitoring while the project progressed Asbestos abatement is a regulated field. TEX.OCC.CODE ANN. § 1954.002(8) and § 1954.051. The Texas Department of Safety Health Services (the Department) has promulgated regulations that define the several functions that R&A performed here--asbestos consulting, asbestos project design, and air monitoring. 25 TEX.ADMIN.CODE § 295.32 (7), (13)(18)(Tex. Dep't of State Health Serv., Definitions). It licenses the several positions filled by R&A's employees performing those roles:

9

asbestos consultant, asbestos project manager, and air monitoring technician. *Id.* at § 295.47 (Licensure: Asbestos Consultant); § 295.49 (Licensure: Asbestos Project Manager); § 295.52 (Licensure: Air Monitoring Technician).

### *Consultant*

Under the Department's rules, "asbestos consulting activities" might include (1) designing of asbestos abatement projects, (2) the preparation of plans, specifications, and contract documents, and (3) "the review of environmental controls and abatement procedures for personal protection that are to be employed every day of the asbestos abatement activity, from the start through the completion dates of the project[.]" 25 TEX.ADMIN.CODE § 295.32 (13).

A "consultant agency" must be licensed by the Department to design asbestos abatement projects. *Id*. at § 295.48(a)(Licensure: Asbestos Consultant Agency). The agency in turn employs one or more licensed asbestos consultants. *Id*. An individual consultant may prepare a "project design" which includes several elements: (1) "the survey of public buildings for asbestos-containing building material (ACBM)," (2) "the evaluation and selection of appropriate asbestos abatement methods," (3) "project layout; the preparation of plans, specifications and contract documents," and (4) "the review of environmental controls, abatement procedures and personal protection equipment to be employed at any time during the asbestos abatement activity, from the start through the completion dates of the project." *Id.* at § 295.47(a)(1). By rule, an asbestos project design includes among many other things, "the review of environmental controls, abatement procedures and personal protection equipment to be employed every day of the asbestos abatement activity, from the start through the completion dates of the project." *Id*. at § 295.32(18).

A consultant's license also allows the consultant to "provide" for "the selection, fit testing, and appropriate use of personal protection equipment, and the development of engineering controls for asbestos-related activities." *Id*. at § 295.47(b)(6). "Asbestos abatement activity" is itself a

10

defined term and includes "[a]sbestos abatement, or any on-site preparations or clean-up related to the abatement." *Id*. at § 295.32(10). "Preparation" is a defined term, and among many other things, includes "installation of scaffolding (in an area in which asbestos maybe disturbed during the installation)[.]" *Id*. at § 295.32(78). A consultant's responsibilities specifically include providing professional services to building owners concerning "compliance with work practices and standards," "requiring compliance with regulations and specifications," and "advise on the selection and use of appropriate personal protective equipment for all asbestos-related activities." *Id.* at § 295.47(h)(2), (4), (5).

### *Project Manager*

R&A's corporate representative testified that one of the hats it wore on this project was a "project manager." An asbestos project manager must be licensed by the Department, and "must be employed by a licensed asbestos consultant agency" to act as the "owner's representative to evaluate the quality of the work being performed during an asbestos abatement project." *Id*. at § 295.49(a)(Licensure: Asbestos Project Manager). The project manager should "(1) monitor the project to document the standards designed to protect project personnel and building occupants, and the adequacy of controls; (2) observe that contractual requirements are being met by the abatement contractor; and (3) consult with contractors on behalf of their clients on the selection and use of appropriate personal protective equipment related to the asbestos abatement activities." *Id*. at § 295.49(a).

And when a consultant is hired by a building owner to perform asbestos project management, "the consultant is responsible to ensure proper procedures are used from the time of arrival of the abatement contractor on site through the completion of the removal of the containment and the departure of the contractor from the project site." *Id*. at § 295.47(a)(1). Robles's supervisor testified that the asbestos manager "basically ensures that the asbestos spec"

11

in the project design is adhered to. The manager could do so, however, only by ordering the work to stop.[2]

### *Air Monitoring*

R&A was also retained to perform air monitoring during the project. In doing so, it set up a device (a manometer) to ensure negative air pressure in the containment zone (i.e., that air moved only into the containment zone, and not out of it). R&A would also take air samples to ensure asbestos particles did not escape the containment zone. An R&A manager agreed that R&A was in charge of the integrity of the containment zone, which required the presence of an R&A employee at the construction site for much of the time that Robles was working. Diaz also suggests that when the plastic containment area tore, an R&A employee could have been the person who noticed the tear and directed that it be fixed.

### Existence and Scope of the Duty

Based on the rules promulgated by the Department, Diaz concludes that under Section 424 of the Restatement, R&A owes a duty "to ensure Diaz and other workers could perform asbestos removal-related activities in a safe manner." Contrary to Diaz's contention, Section 424 of the Restatement does not impose a duty here, and even if it did, the specific regulations do not impose a general duty to ensure Diaz's safety. While the rules impose obligations on R&A under the various roles that it served, each of the arguments Diaz advances runs head-long into established Texas Supreme Court precedent foreclosing an actionable duty in this case.

### *The Restatement (Second) of Torts Section 424 does not apply*

The Texas Supreme Court applied Section 424 in *Sanchez* to impose a duty on a creditor who hired a contractor to do its repossession work. 836 S.W.2d at 153. The contractor had

---

[2] Robles's manager put it this way, "But I will tell you this, that the one power that the consultant does have and the project manager does have is to stop the work." They would do so "if we're not in compliance with the specs."

12

arguably breached the peace in repossessing a car, injuring a member of the public in the process. *Id.* Texas law, however, only allows a creditor to undertake a self-help repossession if they do not breach the peace. TEX.BUS.&COM.CODE ANN. § 9.609(b)(2). By virtue of that statute, the creditor in *Sanchez* was responsible for the conduct of the contractor it hired. The critical distinction here is that R&A did not hire Robles, Simon Properties did.

By its text, Section 424 it applies to failures "of a contractor *employed* by [the defendant]." [Emphasis added]. The corresponding section in the Restatement (Third) of Torts carries the same requirement:

> An actor *who hires an independent contractor* for an activity is subject to vicarious liability for physical harm if:
>
> (a) a statute of administrative regulation imposes an obligation on the actor to take specific precautions for the safety of others; and
>
> (b) the independent contractor's failure to comply with the statutory or regulatory obligation is a factual cause of any such harm within the scope of liability.

RESTATEMENT (THIRD) OF TORTS: PHYSICAL AND EMOTIONAL HARM, § 38 (Am. Law Inst. 2012) [Emphasis added]. Because R&A did not hire Robles, Section 424 of the Restatement does not apply. Another Restatement (Third) provision is more apropos:

> When a statute requires an actor to act for the protection of another, the court may rely on the statute to decide that an affirmative duty exists and to determine the scope of the duty.

RESTATEMENT (THIRD) OF TORTS: PHYSICAL AND EMOTIONAL HARM, § 63 (Am. Law Inst. 2010). This section, however, has not been adopted in Texas. And even if the section does correctly state Texas law, it only provides that a court *may* impose the duty and determine its scope. Were to do so, existing Texas Supreme precedents would preclude the broad duty Diaz here seeks to impose.

### *General obligations to control unrelated matters do not establish a duty*

Many of the regulations that Diaz cites require R&A to perform certain tasks, but tasks seemingly unrelated to that what cause the accident here. For instance, as the project designer,

13

R&A should have evaluated and selected "appropriate asbestos abatement methods," and prepared a "project layout, the preparation of plans, specifications and contract documents." 25 TEX.ADMIN.CODE § 295.47(a)(1). Yet R&A's control over these matters would not impose a separate duty to supervise or enforce fall prevention measures. The high court has made clear that the control must relate to the injury causing event. *See e.g*. *General Elec. Co. v. Moritz*, 257 S.W.3d 211, 217 (Tex. 2008) (agreeing defendant owed a duty over matters in which it exercised control, but not for events that it did not control and which caused the accident); *Lawrence*, 988 S.W.2d at 226 (holding the supervisory control must relate to the activity that caused the injury); *Mendez*, 967 S.W.2d at 357 (requiring "*nexus* between an employer's retained supervisory control and the condition or activity that caused the injury")[Emphasis in original]; *Olivo*, 952 S.W.2d at 528 ("For the general contractor to be liable for negligence, its supervisory control must relate to the condition or activity that caused the injury."); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993)(requiring an inquiry into whether defendant had specific control over the safety and security of the premises, rather than allowing the fact finder to draw inference from defendant's more general control over operations).

Thus, the more general duties imposed by the rules only obscure the relevant inquiry. In *Exxon Corp. v. Tidwell*, for instance, the court held that general statements of obligations in a lease and sales agreement between an oil company and service station operator did not establish the control over safety:

> We think that in a case alleging negligence in maintaining a safe workplace, the court's inquiry must focus on who had specific control over the safety and security of the premises, rather than the more general right of control over operations. Issues concerning control over operations, such as who held title to the gasoline or who set the sanitation standards for the restroom, obscure the true inquiry. The focus should be on whether Exxon had the right to control the alleged security defects that led to Tidwell's injury.

14

867 S.W.2d at 23. Thus, focusing on general obligations that R&A had as the consultant and project manager--unrelated to the cause of the fall--do not create the duty that Diaz urges.

### *Standing alone, the right to enforce workplace rules does not create a duty*

Diaz also focuses on a project manager's duty under the regulations to ensure "proper procedures" are followed, claiming this power elevates R&A's safety role in the project. Yet, the same Department rules place responsibility on the asbestos abatement contractor (Robles) for standards of operation, including those Occupational Safety and Health Administration's (OSHA) regulations that the Department adopts by reference. 25 TEX.ADMIN.CODE § 295.45(f)(1) (Licensure: Asbestos Abatement Contractor).[3] As the asbestos abatement contractor, Robles was also charged with supplying and training its employees "who perform asbestos-related activities in the use of personal protection equipment, and to supervise their compliance[.] *Id*. at § 295.45(f)(5). Robles employed an asbestos abatement supervisor. That supervisor has the responsibility under the Department's rules to comply with any OSHA regulations that the Department has adopted by reference, and to "supply personal protection equipment and train employees who perform asbestos-related activities in the use of equipment, and to supervise their compliance[.]" *Id*. at § 295.46(e)(1) and (4)(Licensure: Asbestos Abatement Supervisor). Moreover, asbestos workers, such as Diaz are registered. *Id*. at § 295.42(a)(Registration: Asbestos Abatement Workers). They must complete a training course and are responsible for complying with any EPA and OSHA regulations as adopted by reference under the Department's rules. *Id*.

---

[3] In Section 295.33(a) of its rules, the Department adopts by reference the following:

   (1) 40 CFR Part 61, Subpart M, titled, 'National Emission Standard for Asbestos' (NESHAP), July 1, 1997, as amended; and
   (2) 40 CFR Part 763, Subpart E, and Appendices A, B, C, and D, titled, 'Asbestos' July 1, 1997, as amended.

25 TEX.ADMIN.CODE § 295.33(a)(1)(2). The OSHA fall prevention regulations, however, are found at 29 CFR 1926.104 and 1926.500 et. seq. Of course, Robles would have an independent obligation to comply with any OSHA rules aside from whatever the project design required.

15

at § 295.42(e). Finally, the "building owner retains the primary responsibility for compliance" with the Department's rules regarding the "presence, condition, disturbance, renovation, demolition, and disposal of any asbestos encountered in the construction, operations, maintenance, or furnishing of that building or facility[.]" *Id*. at § 295.34 (b)(Asbestos Management in Facilities and Public Buildings).

Moreover, generally insisting that a subcontractor comply with federal laws, general safety guidelines, or other standard safety precautions does not impose an unqualified duty to ensure that the subcontractor does nothing unsafe. *Mendez*, 967 S.W.2d at 357-58. Rather, imposing those type of obligations creates only a limited duty that any safety requirements and procedures the general contractor imposes do not "unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* They might also impose a duty when the employer is aware that its contractor "routinely ignores applicable federal guidelines and standard company policies related to safety." *Mendez,* 967 S.W.2d at 357. There is no evidence here, however, that Robles routinely ignored OSHA fall prevention rules, or that any safety standard that R&A urged increased the risk or severity of the accident.

Finally, under existing law an owner-occupier may have a duty to stop a single breach of a critical safety rule, but for the duty to attach, the party must have actual notice of breach as well as the right to stop the work. Two cases illustrate the point. In *Tovar v. Amarillo Oil Co.*, an oil company's contract with a driller allowed it to suspend drilling operations "in the event of carelessness, inattention, or incompetency" by the driller. 692 S.W.2d at 470. The court held that the oil company owed a duty to the driller's employees to exercise that contractual right when the oil company became aware that the independent contractor was violating a specific, critical safety provision in the drilling contract regarding a blow-out preventer. *See id.* Similarly, in *Lee Lewis*

16

*Const., Inc. v. Harrison*, the general contractor assigned a job superintendent the responsibility to routinely inspect the construction area to see that subcontractors and their employees properly utilized fall protection equipment. 70 S.W.3d at 784. That supervisor personally witnessed and approved of the specific fall-protections systems that a subcontractor used, and was aware that the subcontractor used an inappropriate system. *Id.* Under those circumstances, the court affirmed a judgment based on the general contractor's failure to monitor safety on the worksite. *Id.* Actual notice of the safety failing is critical to the duty. As the Texas Supreme Court more recently stated, "We 'have never concluded that a general contractor actually exercised control . . . [when] there was no prior knowledge of a dangerous condition and no specific approval of any dangerous act.'" *Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015), *quoting Bright,* 89 S.W.3d at 609.

Diaz did not produce any evidence that R&A was aware that Diaz would need to, or did in fact, unhook his lanyard before walking over the false ceiling. Diaz himself testified that persons on the ground level could not see him because of the false ceiling. Diaz's counsel elicited this exchange:

> [COUNSEL]: All right. Now if the air monitors, slash, project designer was in the containment zone, would they have been able to see you and your co-workers up in the roof?...Or up in the ceiling?
>
> [DIAZ]: No.
>
> [COUNSEL]: All right. They couldn't see you from down below?
>
> [DIAZ]: No.
>
> [COUNSEL]: Could they hear the work being done up there and see the, the materials crashing down?
>
> [DIAZ]: I don't think so. [form objections omitted]

Another worker in the area, Javier Rincon, testified that Diaz fell at a point which was about twenty feet away from where the other workers were at, and that "No one, absolutely no one, was able to

17

see what happened." The evidence here did not raise a genuine issue of material fact that R&A knew of any deficiency of the fall prevention system.

### *The obligations pertaining to PPE do not create an actionable claim*

The Department's regulations specifically require R&A to review, advise, and consult on "personal protective equipment" (PPE). *E.g.* 25 TEX.ADMIN.CODE §§ 295.32(13), 295.49(e), 295.47(a)(1). Diaz developed evidence of a nexus between his fall protection device and the cause of the accident. He contends here that the PPE requirements place a duty on R&A as the asbestos consultant or the project manager to oversee PPEs, which included fall protection. R&A, however, contends the term PPE in the rules is limited to devices specific to asbestos abatement, such as respirators and protective clothing. In this respect, we agree in part with Diaz.

A court should interpret administrative rules as it would a statute, applying traditional principles of statutory construction. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). Our primary focus in statutory interpretation is to give effect to legislative intent, considering the language of the enactment, as well as its history, the objective sought, and the consequences that would flow from alternative constructions. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex. 2000). We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We begin with the plain and ordinary meaning of the enactment's words, using any definitions provided by the enacting body. *See Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). We also presume that every word in a statute has been used for a purpose and that every word excluded was excluded for a purpose. *Emeritus Corporation v. Blanco*, 355 S.W.3d 270, 276 (Tex.App.--El Paso 2011, pet. denied).

18

A fall protection system fits within the ordinary meaning of the terms personal protective device. "Personal" means "relating to a particular person[.]" *Webster's Third New Int'l Dictionary,* 1686 (unabridged ed. 2002). "Protection" means "preservation from injury or harm[.]" *Id*. at 1553. "Equipment" means "anything kept, furnished, or provided for a specific purpose. *Id*. at 656. A harness and lanyard are components of a fall protection system, and are designed to protect workers from the hazards of falls. *See* 29 C.F.R. § 1910.140 (defining "personal fall arrest system" as "a system used to arrest an employee in a fall from a walking-working surface" and includes a body harness, anchorage, and connector such as a lanyard). OSHA in fact places "Personal Fall Protection System" regulations in a section of its rules labeled "Personal Protection Equipment." *Id*.

In effect, R&A would have this Court insert a limiting adjective in front of the phrase "personal protection equipment" so as to limit its meaning to only asbestos related safety devices. The Department did not do so here, even though it has limited the term's meaning elsewhere. For instance, in its "hazard communication" rules that require certain risks be communicated to workers, it has provided a specific and limiting definition for the term PPE. 25 TEX.ADMIN.CODE § 295.12 (Tex. Dep't of State Health Serv., Employee Notice; Rights of Employees)(employers shall provide appropriate PPE to employees who may be exposed to hazardous chemicals in their workplace); 25 TEX.ADMIN.CODE § 295.2 (Definitions)(defining "appropriate personal protective equipment (PPE)" to mean that which protects workers from chemical exposure). The Department has also uniquely defined the term PPE in its blood borne pathogen regulations. 25 TEX.ADMIN.CODE § 96.101 (Tex. Dep't State Health Serv., Definitions)(in blood borne pathogen regulations, PPEs defined to include specialized clothing or equipment worn by an employee for protection against a hazard, but not general work clothing); *see also* 16 TEX.ADMIN.CODE § 149.22

19

(Tex.Dep't Licensing & Regulation, Minimum Work Practices and Procedures for Mold Remediation)(for mold remediation, requirement to provide PPE refers to a particular class of respirators). The fact that the Department did not choose to specifically define the term in its asbestos regulations suggests it did not intend a similar contextual limit. Nor would it would not be unreasonable to assume the Department of Health would be concerned with worker safety (and thus health) while abating asbestos at height, such as with the asbestos textured ceilings found in this project.[4]

In the construction setting, a fall arresting device has long been referenced as a PPE. *See Turner Commun. Corp. v. Occupational Safety and Health Rev. Commn.*, 612 F.2d 941, 944 (5th Cir. 1980). Fall prevention devices are part of PPE in the OSHA regulations. *See* 29 C.F.R. § 1910.140; 29 C.F.R. § 1915.152(a)(shipyard regulations requiring use of PPE that would include "personal fall protection equipment"). R&A does not offer any agency interpretation of the term that would explain or vary its common meaning. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011)(courts defer to agency interpretation of a statute or rule that is vague, ambiguous, or allows for room for policy determinations). And a court is bound by a term's ordinary meaning unless an enactment uses a term with a particular meaning or defines it in a particular way. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *In re Hall*, 286 S.W.3d 925, 928-29 (Tex. 2009). Here, we are constrained to take the regulations as we find them and conclude that the Department's use of the term PPE would include fall protection devices. *See Simmons v. Arnim*, 110 Tex. 309, 220 S.W. 66 (1920)("Courts must take statutes as they find them. More than that, they should be willing to take them as they find them.").

---

[4] R&A frets that a general definition for PPEs would place consultants in the position of having to guard against non-asbestos related risks, such as from electrical systems. We note, however, that the regulations already specifically require the consultant to call in a professional engineer if abatement alters a building's structural, electrical, mechanical, safety systems, or their components. 25 TEX.ADMIN.CODE § 295.47(a)(2).

Yet parsing the duty is important, for it is a limited one based on the wording of the regulations. R&A was required to "review" "advise" and "consult" on the selection of PPEs. 25 TEX.ADMIN.CODE §§ 295.32 (13)(18), 295.47(a)(1), 295.49(e). None of these terms explicitly give R&A the authority to direct what PPE that Robles had to use or how to use it. Rather, they describe what the Restatement expressly states is not control: "to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." RESTATEMENT (SECOND) OF TORTS § 414, *quoted* in *Chapa*, 11 S.W.3d at 155.

Diaz points out that R&A's project design does in fact set some *requirements* for PPEs. As R&A freely admits, those requirements all pertain to respirators and asbestos protective clothing. Because R&A through its project design required one class of PPEs, we must determine if R&A's PPE requirements increased the risk of this accident, or made its consequences worse. *Mendez*, 967 S.W.2d at 357-58 (noting limited duty that any safety requirements and procedures do not "unreasonably increase, rather than decrease, the probability and severity of injury."); *Bright*, 89 S.W.3d at 610 (same for safety manual that contractor was obligated to follow). Here, however, there is no evidence in this record that Robles altered its fall prevention precautions based on R&A's PPE rules as found in the project design. And indeed, the same project design required Robles to comply with OSHA, which has its own set of fall prevention rules. At most Diaz might complain that R&A should have issued additional PPE requirements in the project design that regulate fall protection. But that argument would run headlong into *Dow Chem. Co. v. Bright*, where the court rejected a duty requiring the property owner to issue additional rules that could have prevented the accident. 89 S.W.3d at 609.

Accordingly, we overrule Diaz's first issue as it relates to imposing a duty based on the Department's regulations.

21

## No Right of Control by Contract

A contract may also give one contractor the authority to control another contractor's actions, whether that authority is ever exercised or not. *Bright*, 89 S.W.3d at 605-06. Here, both R&A and Robles had contracts with Simon Properties, but they did not have a contract with each other. R&A's contract with Simon Properties defined its scope of services as project design and air monitoring. Nothing in R&A's contract with Simon Properties defines those terms any broader than the Department's regulations, which we have already addressed. R&A's project design document provide that its services "do not include supervision or direction of the means, methods, or actual work of the Contractor, its employees or agents." In this instance, Contractor would refer to Robles.

Robles's contract with Simon defines its scope of duty as asbestos abatement, to include demolition of walls and ceilings, and removal of joint compound textured walls and ceilings. The project design provides that Robles was "solely and completely responsible for working conditions on the jobsite, including security and safety of all persons and property during performance of the work" along with compliance with OSHA. Therefore, nothing in the contract documents uniquely gives R&A any control over fall protection.

## No Right of Control by Conduct

A party may also be charged with a duty by exercising actual control on a worksite. *Bright*, 89 S.W.3d at 605-06; *Mendez,* 967 S.W.2d at 357. Diaz claims he raised a genuine issue of material fact for that type of control. We disagree.

Juan E. Ayala served as R&A's project manager on the first day of the job (the accident was several days later). He testified that:

> [COUNSEL]: All right. Did R&A instruct the other workers on this project what personal protective equipment they would need?

22

[AYALA]: Yes.

[COUNSEL]: What did you instruct them they would need?

[AYALA]: They would need full-face respirators and the protective clothing.

[COUNSEL]: So R&A set out what PPE they would need?

[AYALA]: Yes.

[COUNSEL]: Anything else?

[AYALA]: Not that I remember.

The PPEs that he referred to, however, were the clothing and respirators uniquely required in asbestos abatement projects. He also testified that he would go into the containment zone, for possibly five to ten minutes at a time and "supervise" what the workers were doing. He clarified, however, that he was concerned from a safety standpoint with the workers' exposure to asbestos. A daily log that the R&A project manager completed at times noted Robles' workers were wearing PPEs, but specifically identified them as masks, boots, and gloves. Even if this testimony raised an inference for control, it did so for the kind of PPEs that are unique to asbestos, and not fall prevention. And because there must be a nexus between the control and the injury-causing event, this evidence would not establish the kind of control Diaz needed to survive summary judgment.

Diaz also relies on R&A's project design document that sets out several detailed requirements for the job, such as working hours, coordination and scheduling of the work, storage of chemicals, ratio of workers to supervisors, acceptable materials for containment, and tools and equipment. None of these matters pertain to the cause of this accident, and like the indicia of control in *Exxon Corp. v. Tidwell*, they obscure the true inquiry. The project design does require that construction shall conform to several codes, including the Occupational Safety and Health Act. Yet, the same section, states that the "Contractor shall be solely responsible for the adequacy of safety precautions during the entire project, twenty-four hours per day, seven days per week."

23

Diaz also emphasizes the testimony of a Robles's supervisor, Arturo Mimbela. He agreed that R&A was in charge of the project and would make sure the job was done safely. A window looking into the containment zone allowed the R&A employees to observe operations. Mimbela testified that R&A would "tell us what to do; if we were doing something wrong, they'll point it out to us." With regard to fall protection, Mimbela believed that if an R&A project manager directed that a worker be tied off, Robles would be required to "listen" to that direction. He recalled instances *on other jobs* where R&A had told him that Robles employees were not properly tied off, and that he needed to get that corrected. The three to four hours Mimbela spent on this job, however, were mostly spent loading bags on a loading dock. He never went inside the containment area. Nor did he have any substantive discussions with any R&A employee on this job. And most importantly, he did not witness any acts of R&A's control on this particular project.

His testimony does not aide Diaz. First, his view of the parties contractual and legal rights cannot vary the contract terms, or the text of administrative regulations. His testimony could only be relevant to actual control exercised on this project, and even accepting his testimony in the light most favorable to Diaz, Mimbela was not testifying to what happened on this project. That R&A might have controlled fall protection on some other project does not prove what happened here. Nor does his testimony about what Robles might have done show any more than the possibility of control, which is insufficient to impose liability. *See Lawrence*, 988 S.W.2d at 226 (testimony from subcontractor employees that they would have would have taken direction from the owner-occupier had it been offered only created the "possibility of control" and did not establish any duty); *Gomez v. Saratoga Homes*, 516 S.W.3d 226, 237 (Tex.App.--El Paso 2017, no pet.)(holding the retained the right to give general safety instructions to contract workers, conducting safety

24

inspections, and authorizing corrective actions to address known safety issues "establishes only the possibility of control" and was insufficient to impose a duty).

Finally, Diaz contends he raised sufficient evidence to show that an R&A employee may have been the person that actually ordered him to fix the tear in the containment sheeting. Viewing the evidence in the light most favorable to Diaz, R&A would have likely had an employee on site to perform the asbestos monitoring. That employee would have likely been aware of a drop in negative pressure in the containment zone. Based on the usual protocol for containment zone breaches, that employee may have gone inside the containment zone to look for the leak and ensure it was repaired.

Diaz, however, testified that he not know who directed him to fix the tear. A co-worker testified it was a Robles' leadman. Even viewing the evidence in the light most favorable to Diaz, the fact that an R&A employee may have known of the leak, pointed it out the Robles, and ask that it be fixed would not create the duty that Diaz urges here. The project management document explicitly makes Robles responsible for repairing any breaches in the containment zone. It states the contractor had the responsibility to "Ensure that all barriers and plastic sheeting enclosures remain effectively sealed and taped for duration of abatement and subsequent cleaning." If R&A called Robles's attention to a leak in the containment zone, it did no more than call its attention to a specification imposed by the owner. It is not evidence that R&A specifically ordered Diaz to perform the task, much less that it knew of how he was transferring his lanyard from one anchor point to the next. This evidence simple does not impose a duty to supervise every aspect of how Robles was to accomplish its work of fixing the containment zone.

In summary, Diaz has not established a negligence duty based either on the Department's administrative regulations, the parties contract, or the exercise of any actual control that reaches

25

the apparent cause of this accident--the inadequate fall prevention system that Robles employed. R&A also moved for summary judgment below on other specific claims asserting by Diaz, including premises liability, gross negligence, and joint enterprise. No specific challenge to the summary judgment as to those claims is urged on appeal. We overrule Diaz's single point and affirm the judgment below.

April 10, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.