COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| LAWRENCE E. MEYERS, AS MANAGER OF THE RAMON BURSTYN IRREVOCABLE TRUST, | § § § | No. 08-19-00108-CV |
| Appellant, | § | Appeal from the |
| v. | § | 345th District Court |
| 8007 BURNET HOLDINGS, LLC, JOHN REESE NELSON, ANTONIO CALVO, LINDA CALVO, J.M.N. ENTERPRISES, LLC, and 8007 BURNET ROAD, AUSTIN, TEXAS, IN REM, | § § § § | of Travis County, Texas (TC# D-1-GN-16-006155) |
| Appellees | § § | |

# **O P I N I O N**

In this statutory nuisance case, we are asked to review claimed error in the jury charge, and the sufficiency of the evidence to support the jury's verdict, as well as to decide whether a judge or jury should set the amount of attorney's fees due the prevailing party. We affirm the judgment below.

## I. BACKGROUND

We limit our recitation of the facts to those that are relevant to the present inquiry.

1

The disputants here are adjacent property owners on Burnet Road in Austin, Texas.[1] Appellant Lawrence Meyers, as manager for the Burstyn Irrevocable Trust ("the Trust"), owns property at 8001 and 8003 Burnet Road. The Trust leases one of its two developed lots to a motorcycle repair shop and the other to an optometrist. Appellee 8007 Burnet Holdings, LLC owns what was originally a nursing home located at 8007 Burnet Road. Appellees John Reese Nelson, Antonio Calvo, Linda Calvo, and J.M.N. Enterprises, LLC either own or manage 8007 Burnet Holdings, LLC and we collectively refer to them as "Burnet Holdings."

Burnet Holdings acquired its property in July 2015. The previous owner leased the property to Yvette McKinney, doing business as "Zoe's Safe Place" under a three-year lease that ended on January 31, 2018. That lease was assigned to Burnet Holdings. Zoe's Safe Place ("Zoe's") was something of a boarding house that catered to people with mental health issues. And therein the problems first arose.

The residents of Zoe's at times wandered onto the adjacent motorcycle shop and optometrist office located at 8003 and 8001 Burnet Road. As an employee of the motorcycle shop explained, "You know, it's just a lot of people with just nothing but time on their hands with--you know, trying to find entertainment or money or drugs, however they could." For the motorcycle shop, that resulted in Zoe's residents panhandling, urinating, defecating, and even engaging in sexual acts on the motorcycle shop's leasehold.[2] On one occasion, a person from Zoe's came to

---

[1] This case was transferred to us from the Third Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. We follow the precedents from that court where they might conflict with our own. TEX.R.APP.P. 41.3.

[2] The owner of the motorcycle shop testified that:

> People would come over to the property to talk to me or our customers, ask for money, ask for a cigarette, ask if we could light their cigarette. There was different people that would come over for different reasons. Some would just come over and start talking nonsense and didn't make sense. Some would seem very angry. There was a man that would come over and always wanted to put his hand on my shoulder and say things I didn't understand, and I didn't care for that.

the motorcycle shop demanding a tire iron so that he could assault another person. Additionally, one of the motorcycle shop's customers by accident parked in front of 8007 Burnet. He was accosted by a group of eight persons, at least some of whom were Zoe's residents. A particular resident, identified as an onsite manager, broke that same customer's windshield with a tire iron, and later chased the customer with a broom stick.

The situation was little better for Dr. Yee, the optometrist at 8001 Burnet Road. She complained that Zoe's residents would loiter around the parking lot and would also come into her office to engage with her patients.[3] Some persons would sleep in a garden area at one end of her leasehold, and another defecated there. Dr. Yee's receptionist saw people trying to have sex at the side of their building. When Dr. Yee's receptionist confronted one woman who was lifting up her dress and exposing her undergarments, that person and her friend came back the next day and made a scene in the reception area. One man came into her waiting room and urinated in a chair. Dr. Yee also witnessed what she believed was a drug deal in the parking lot.

Several people from the adjacent neighborhood attested to persons urinating, drinking, loitering, as well as using marijuana near 8007 Burnet. They recalled one Zoe's resident who would stand along the sidewalk "flipping people off" and yelling at passing motorists. He would also come onto the property at 8001 and 8003 Burnet Road and do the same thing.

The Austin Police Department was drawn into the situation based on numerous 911 and 311 calls originating from the 8007 Burnet address. Several witnesses testified that some type of emergency vehicle was at 8007 Burnet almost every day, and sometimes multiple times a day. The Austin Police Department has a nuisance enforcement unit. It issued a report dated September 6, 2016, that noted five credible offenses triggering a potential statutory nuisance

---

[3] Some of the Zoe's residents, however, were actually her patients.

charge. The incidents ranged from sexual assault to aggravated assault, spanning from October 2015 to May 2016. The Austin Police Department served its notice on Burnet Holdings, as owner of the property. The notice included nine suggested courses of action to remedy the problem. The city closed its case, however, after meeting with Burnet Holdings and thereafter receiving only one additional report of an abatable offense.

The Trust filed suit against Burnet Holdings and Zoe's in December 2016.[4] The Trust initially asserted claims for common law nuisance, trespass, and negligence pertaining to the actions of Zoe's residents. The Trust also asserted a civil conspiracy claim that alleged Burnet Holdings was effectively using Zoe's to drive down the value of the Trust's properties so it could purchase, and then redevelop the entire block.[5] In response to the suit, Burnet Holdings informed the Trust that it would evict Zoe's by May 2017. And during the initial course of the litigation, Burnet Holdings served Zoe's with a notice of default and demand to vacate. The notice was based on non-monetary breaches, such as the failure to list Burnet Holdings as an additional insured on the property, but not the issues with Zoe's residents. Burnet Holdings never followed through with the eviction because Zoe's remedied the claimed breaches. Later, the Trust settled its claims against Zoe's. One term of the settlement required that Zoe's vacate the property at the end of its lease--January 31, 2018.

---

[4] There was little pre-lawsuit communication between Burnet Holdings and the Trust. In May of 2016, the Trust notified Burnet Holdings that a resident of Zoe's had knocked down a fence section between 8007 and 8003 Burnet. The Trust requested that Burnet Holdings fix the fence, which it apparently did after a follow up email. The Trust's representative agreed that it never sent a pre-suit demand letter to Burnet Holdings because of the estimated cost of preparing the demand letter. The Trust points out, however, that none of the causes of action at issue here require any written pre-suit notice.

[5] In May 2015, Burnett Holdings had made an offer to buy the Trust's lots. It apparently had a ten-year plan to buy several adjacent properties for future development. The Trust was not satisfied with the offer and made no counteroffer. Other adjacent property owners flatly said they were not interested in selling.

4

After Zoe's vacated the property, the motorcycle shop agreed that problems with vagrants or like people disturbing its business subsided. Neither Dr. Yee, nor the motorcycle shop complained to the Trust about any further property damage or theft from their leaseholds. The Trust, however, contended there were still like incidents, but conceded the frequency was reduced. Still not satisfied with the situation, the Trust shifted its focus to how Burnet Holdings managed the now vacant property. Apparently, thieves soon broke into the building to steal copper wire. The Trust complained that windows were broken out, and homeless people were sleeping on the property. It also noted that trash, such as mattresses, were dumped on the property. A neighbor described piles of rock and construction debris on the property as an "eyesore."

In April 2018, the Trust amended its petition to add a statutory nuisance under Chapter 125 of the Texas Civil Practices and Remedies Code. As contemplated by that statute, the amended petition named the property "in rem" as a defendant.[6] Under the statutory nuisance claim, the Trust sought an injunction, an order requiring Burnet Holdings to close the premises for a year following entry of judgment, and the appointment of a receiver to manage the property.

At trial, the Trust presented the evidence that we summarize above regarding the conduct of Zoe's residents, and the condition of 8007 Burnet following Zoe's departure. Conversely, Burnet Holdings advanced several defensive theories, including that: (1) the statutory nuisance claim applies only when the defendant maintains a place to which "persons habitually go for" the

---

[6] The statutory nuisance claim allows this relief:

> If judgment is in favor of the petitioner, the court shall grant an injunction ordering the defendant to abate the nuisance and enjoining the defendant from maintaining or participating in the nuisance and may include in its order reasonable requirements to prevent the use or maintenance of the place as a nuisance. If the petitioner brings an action in rem, the judgment is a judgment in rem against the property as well as a judgment against the defendant. The judgment must order that the place where the nuisance exists be closed for one year after the date of judgment.

TEX. CIV. PRAC. & REM. CODE ANN. § 125.002(e).

purpose of committing various specified crimes, and no one moved into Zoe's with the intent to commit any of those crimes; (2) Burnet Holdings took reasonable steps both before and after Zoe's left to ameliorate any problems; and (3) the Trust's damage claims were unsubstantiated or overclaimed.

The jury answered a series of liability questions favorably to Burnet Holdings: (1) the jury failed to find any trespass; (2) the jury failed to find any damages for a private nuisance, even though a number of parties, including Burnet Holdings, were found to have created a private nuisance; (3) the jury failed to find that Burnet Holdings intentionally maintained a statutory nuisance; (4) the jury failed to find a conspiracy; and (5) that Burnet Holdings incurred $41,359.50 in reasonable attorney's fees through trial, with additional amounts for successive stages of any appeal. Following post-trial motions, the trial court entered a judgment that the Trust take nothing. Additionally, the trial court set aside the jury's finding on the amount of attorney's fees and made its own finding that Burnet Holdings incurred $122,482.50 in trial court fees, which it awarded as a part of the judgment.

## II. ISSUES ON APPEAL

On appeal, the Trust raises four issues: (1) the trial court erroneously charged the jury on the statutory nuisance claim; (2) the jury, and not the trial court should determine the amount of attorney's fees for the prevailing party; (3) the jury's failure to find a statutory nuisance was against the great weight and preponderance of the evidence; and (4) the Trust established a breach of the statutory nuisance claim as a matter of law.

6

**A. Charge Error**

*1. The applicable law.*

To properly explain the claimed charge error, we start with an overview of the statutory nuisance claim under Chapter 125 of the Texas Civil Practices and Remedies Code. Either a private person, the attorney general, or a district, county, or city attorney may bring a suit to enjoin and abate a "common nuisance" as defined by Chapter 125. TEX.CIV.PRAC.& REM.CODE ANN. § 125.002. Section 125.0015(b) defines the term "common nuisance":

> A person maintains a common nuisance if the person maintains a multiunit residential property to which persons habitually go to commit acts listed in Subsection (a) and knowingly tolerates the acts and furthermore fails to make reasonable attempts to abate the acts.

*Id.* § 125.0015(b). Subsection (a) in turn lists twenty-seven predicate acts prohibited under several Texas Codes (Penal, Occupations, Health & Safety, and Local Government). *Id.* § 125.0015(a)(1)-(27). Translating the statutory elements to this case, the Trust needed to prove that Burnet Holdings maintained a multiunit residential property: (a) to which persons habitually went to commit one or more of the specified prohibited acts, (b) Burnet Holdings knowingly tolerated the acts, and (c) it failed to make reasonable steps to abate the acts. *See Kim v. State*, 451 S.W.3d 557, 561 (Tex.App.--Houston [1st Dist.] 2014, pet. denied) (setting forth elements of claim).

*2. The charge as given.*

Tracking the statutory language from Section 125.0015, the jury charge here included an instruction that defined a common nuisance as:

> A party who maintains, owns, uses, or is a party to the use of a multiunit residential property or other place to which persons habitually go for any one or more of the following purposes and who *knowingly* tolerates the activity and furthermore fails to make reasonable attempts to abate the activity maintains a common nuisance (emphasis supplied).

7

The instruction additionally sets out the elements for six of the twenty-seven prohibited acts which the Trust had claimed were committed by residents of Zoe's or persons trespassing at 8007 Burnet after Zoe's left. The jury question, however, was worded in this way:

**QUESTION NO. 7**

Did any of the following parties intentionally maintain a common nuisance?

"Intentionally" means that the party acted with intent with respect to the nature of its conduct or to a result of its conduct when it was the conscious objective or desire to engage in the conduct or the result.

The jury answered this question "no" as to Burnet Holdings and as to Zoe's.

### 3. *The complaint on appeal.*

On appeal, the Trust argues that Question Seven misstates the law on what it had to prove to prevail on a claim for statutory common nuisance. Specifically, the question added an "intentionality" requirement in the jury question that combined with the "knowingly" requirement in the instructions, makes it impossible to determine which standard the jury used. On appeal, the Trust claims the "multiple *mens rea* requirements, both as to ultimate liability and predicate acts, render[s] it inherently confusing."

### 4. *Standard of Review.*

We review charge error for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 158-59 (Tex.App.--Austin 2017, pet. denied). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003), *citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). But because a trial court has no discretion to misstate the law, we review de novo whether an instruction in a jury charge misstates the law based on improper

8

statutory construction. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002). Even if the trial court has abused its discretion, we reverse only when the error is shown to be harmful. *See* TEX.R.APP.P. 44.1(a)(1); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex.App.--Austin 2001, pet. denied).

### 5. *Preservation.*

Our decision point in this case, however, turns on the preservation of error. The Trust advances several arguments on why the charge is erroneous. It also argues in its brief that the error was reasonably calculated to and probably did cause rendition of an improper judgment. Burnet Holdings does not respond to those arguments. Instead, it pitches its response solely on the claim that the Trust waived any error by consenting to the charge at an informal charge conference and failing to make a sufficient objection at the formal charge conference. To explain those claims, we need to add some detail into how the charge was put together.

Rule 271 provides that the court will prepare the charge. TEX.R.CIV.P. 271. The trial court here apparently had the assistance of a court staff attorney who worked with the parties in formulating the charge. During trial, that staff attorney circulated a draft charge. At the time the charge was circulated, Question Seven asked, "Did any of the following parties intentionally create a *public nuisance*?" (emphasis added), which was followed by a definition of the term "intentionality." The prefatory instructions also contained a definition for "public nuisance" that described "conduct unreasonably interfer[ing] with a public right or public interest." That draft charge also defined the term "unreasonable interference." The trial court's staff attorney emailed the draft with an explanatory note stating that a "statutory public nuisance" claim required the intentionality requirement to, (1) comport with the statutory language, and (2) for it to serve as a predicate for the conspiracy claim that the Trust was also pursuing. The Trust's counsel made

9

non-substantive edits to this portion of the draft charge and replied back to the staff counsel that his analysis "sounds good."

The trial court's final charge, as we note above, differed from this earlier draft. The final charge omitted any mention of a public nuisance, dropped the definition of public nuisance and unreasonable interference, and instead asked about a common nuisance. At the final charge conference, the Trust counsel made this objection to the charge:

> [TRUST'S COUNSEL]: And Plaintiff objects to the language in Question No. 7. The language, "Did any of the following parties intentionally maintain a common nuisance," should be, "Did any of the following parties maintain, own, use, or is a party to the use, of a common nuisance," because it's confusing.
>
> THE COURT: Overruled.

Texas Rules of Civil Procedure 274 provides, "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." TEX.R.CIV.P. 274. And under Rule 274, "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." *Id*. The rule creates a two-pronged test: objections to the charge must specify the error and the legal basis of the objection. *Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 892 (Tex.App.--El Paso 2005, pet. denied), *citing Castleberry v. Branscum*, 721 S.W.2d 270, 276-77 (Tex. 1986); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). Our Court has written that Rule 274 is strictly construed and embodies a "rigorous standard for sufficiency of charge objections." *Abell*, 157 S.W.3d at 892.

Burnet Holdings first urges that opposing counsel's email note that an earlier draft "sounds good" signaled its desire to include the intentionality verbiage and instruction. Under what is termed the invited error doctrine, a party cannot complain on appeal about an action that the trial court took at the request of the complaining party. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d

857, 862 (Tex. 2005); *N.E. Texas Motor Lines, Inc. v. Hodges*, 158 S.W.2d 487, 488 (Tex.[Comm'n Op.] 1942) (" It is an elementary principle supported by many authorities that a litigant cannot ask something of a court and then complain that the court committed error in giving it to him."). We decline to apply that doctrine here because the draft charge that was circulated, and commented on, was different from the final version. The first draft charge asked about "public nuisance" and provided a definition for the same, while the final charge asked about "common nuisance" with its own set of definitions. The invited error doctrine applies when a party "unequivocally take[s] a position in the trial court that is clearly adverse to its position on appeal." *Tittizer*, 171 S.W.3d at 862, *citing Am. Sav. & Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581, 589 (Tex.1975) ("One of the requirements for application of the doctrine of judicial estoppel is that the statement must be deliberate, clear, and unequivocal."). Given the change in the charge language, and vagaries in the terse email reply of "sounds good," we decline to find estoppel in that fact alone.

Burnet Holdings' second argument is that the objection made at the charge stage fails to comply with Rule 274 because it never told the trial court *why* the charge was wrong. And significantly, the Texas Supreme Court in *Castleberry v. Branscum* specifically held that an objection stating that an instruction "may confuse the jury" or "prejudice the defendant" was too general because it did not explain "why the instruction [was] legally incorrect[,]" or "how it would confuse the jury or prejudice the defendants." 721 S.W.2d at 277. Similarly, the Trust here objected that a different Question Seven should be used because otherwise the question is "confusing." That objection, however, never explains why the question as worded is confusing, nor does it explain how the addition of the intentionality requirement adds an element not required by Chapter 125, or conflicts with the "knowingly" standard already found in the instructions. We conclude that the bare objection that the charge as given was "confusing" did not adequately

11

preserve error.  *Castleberry*, 721 S.W.2d at 277; *see also Burbage v. Burbage*, 447 S.W.3d 249, 258 (Tex. 2014) (objection that did not explain *Casteel* problem with submission failed to preserve that complaint).

The Trust responds, however, that its oral recitation of a form of the question (dictated into the record) should have alerted the trial court to the problem with the charge.  And indeed, we generally require a timely objection "stat[ing] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, *unless the specific grounds were apparent from the context*[.]"  (emphasis added).  TEX.R.APP.P. 33.1.  In effect, the Trust argues that the alternate oral submission implicitly demonstrates the trial court's awareness of the complaint now urged on appeal.  The alternate submission did not contain the word "intentional" nor a definition of that term.  Had the trial court placed a transcript of the alternate submission side by side with the given charge, that distinction might have become apparent.  But the alternate submission differed in another significant way with the charge as given.  Question Seven asked whether any defendant "maintain[ed] a common nuisance."  The alternate submission added other ways in which the defendants might have been connected to a common nuisance: "Did any of the following parties maintain, *own*, *use*, or is a *party to the use*, of a common nuisance[?]" (emphasis added).  It is just as likely that the trial court might have perceived this added verbiage as the gist of the objection.

Certainly, the trial court's appreciation of a party's position, and rejection of it in a timely fashion, is the cornerstone of preservation.  *State Department of Highways & Public Transportation v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992).  Yet we cannot ignore the realities of trial practice.  As the court wrote in *Cruz v. Andrews Restoration, Inc.*:

> Trial courts lack the time and the means to scour every word, phrase, and omission
> in a charge that is created in the heat of trial in a compressed period of time.  A

proposed charge, whether drafted by a party or by the court, may misalign the parties; misstate the burden of proof; leave out essential elements; or omit a defense, cause of action, or (as here) a line for attorney's fees. Our procedural rules require the lawyers to tell the court about such errors before the charge is formally submitted to a jury. TEX. R. CIV. P. 272. Failing to do so squanders judicial resources, decreases the accuracy of trial court judgments and wastes time the judge, jurors, lawyers, and parties have devoted to the case.

364 S.W.3d 817, 829-30 (Tex. 2012). Consequently, the court in *Cruz* concluded that the mere filing of a pretrial charge that included a subpart of a question that was omitted from the final charge did not sufficiently alert the trial court to the issue. *Id.* at 831. By the same token, the oral dictation of the text of a question at the same time charge objections were made did not alert the trial court to the problem with its existing question without something more.[7] Had counsel explained why its suggested charge more closely followed the statute, we might view the situation differently. But leaving the task of discerning the differences between the two forms of the questions to the trial court simply asks too much.

The Trust directs us to *Holubec v. Brandenberger*, 111 S.W.3d 32 (Tex. 2003) as support for the adequacy of its objection. The critical issue in that case was whether a farm was run a certain way for at least one year before suit was filed--if it was, the suit was barred, and if not, a repose statute did not apply. Rather than inserting the one-year date, the trial court used a date that was off by more than ten years. The aggrieved party had objected to the charge's wording, but only by a "naked" objection to the date used. *Id*. at 38. The party had also requested a different question that used the correct date but was otherwise defective in its wording. The court of appeals found a waiver. The Texas Supreme Court disagreed, noting that the complaining party had "specifically objected to the date submission." *Id*. at 39. We nonetheless find the case

---

[7] Rule 273 also requires that requested questions, definitions, and instructions "shall be made separate and apart from such party's objections to the court's charge." TEX.R.CIV.P. 273.

distinguishable. The party explicitly objected to the key term in the question as given (the date) and then called the court's attention to its requested question that used the correct date.[8] Given the importance of the date to the statute of repose defense, there is little doubt the trial court would have been aware of the significance of the date. Here by contrast, there was no explicit reference to the inclusion of the objectionable term (the intentionality element) and the trial court was left to discern that on his own.[9]

The Texas Supreme Court reminds us that "[o]ur procedural rules are technical, but not trivial." *Burbage*, 447 S.W.3d at 258. While we construe those rules liberally so that the right to appeal is not lost unnecessarily, "we cannot make assumptions" when an objection fails to explain the nature of the error. *Id.* "Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the opportunity to first consider and rule on error." *Id.* Because the objection here was not sufficient to apprise the trial court of the issue now claimed as error, we overrule Issue One.

---

[8] The actual objection is set out in the court of appeals decision:

> Question 8, we would object to the question in its form particularly the date on there of December 31, 1986. I am marking what I have marked as Question No. 8, Defendants' proposed Question No. 8 which we believe is a substantially correct version of the issue which would be submitted and request the Court and get [sic] the court's ruling on that question.

*Holubec v. Brandenburger*, 58 S.W.3d 201, 208 (Tex.App.--Austin 2001), *rev'd sub nom. Holubec v. Brandenberger*, 111 S.W.3d 32 (Tex. 2003). The requested instruction contained the correct date.

[9] The Trust also cites us to *Smith-Hamm, Inc. v. Equip. Connection*, 946 S.W.2d 458, 464 (Tex.App.--Houston [14th Dist.] 1997, no pet.) and *Gen. Agents Ins. Co. of Am., Inc. v. Home Ins. Co. of Illinois*, 21 S.W.3d 419, 425 (Tex.App.--San Antonio 2000), *disapproved of on other grounds, Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co*., 236 S.W.3d 765 (Tex. 2007). Both cases found that denied written charge submissions helped bolster inadequate charge objections. Our record, however, fails to show that the requested question necessarily alerted the trial court to the specific error which is now claimed.

**B. Legal and Factual Sufficiency of the Evidence**

In its third and fourth issues, the Trust challenges the factual and legal sufficiency of the evidence to support the jury's failure to find a common nuisance. We take the issues together.

*1. Standard of Review-legal sufficiency.*

When a party attacks the legal sufficiency of an adverse finding on an issue for which it has the burden of proof, that party "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). "In reviewing a 'matter of law' challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id.* "If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law." *Id.* "The point of error should be sustained only if the contrary proposition is conclusively established." *Id.*

Legal sufficiency review must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005). When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. *Id*. at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.*

The ultimate test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact finder] to reach the [result] under review." *Id*. at 827.

15

So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier of fact. *Id*. at 821.

### 2. *Standard of Review-factual sufficiency.*

When a party that carries the burden of proof on an issue challenges a fact finder's negative finding on that issue under the factual sufficiency standard, they must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. In entertaining a factual sufficiency challenge, we consider and weigh all evidence in the record, and we can set aside a verdict only if the evidence supporting the adverse finding is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or unjust. *Id.*; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (noting that courts overturning verdicts on factual insufficiency grounds must explain why evidentiary discrepancy is "manifestly unjust; why it shocks the conscience; or clearly demonstrates bias"). A court of appeals may not reverse a verdict "merely because they conclude that the evidence preponderates toward an affirmative answer[;]" rather, reversal is only warranted when a detailed review of the evidence "indicates that the great weight of that evidence supports an affirmative answer." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

### 3. *Application.*

The Trust needed to prove that: (a) persons habitually went to 8007 Burnet to commit one or more of the specified prohibited acts, (b) Burnet Holdings knowingly tolerated the acts, and (c) it failed to make reasonable steps to abate the acts. *See Kim*, 451 S.W.3d at 561 (setting forth elements of claim). As for the second element, the Trust is aided by Section 125.004 that provides: "Proof that an activity described by Section 125.0015 is frequently committed at the place involved or that the place is frequently used for an activity described by Section 125.0015 is prima facie

16

evidence that the defendant knowingly tolerated the activity." TEX.CIV.PRAC.& REM.CODE ANN. § 125.004.

As to the first element, the jury heard a litany of testimony about disturbing acts in or around the property, but little evidence about people habitually going to the property *for the purpose* of committing those acts. Zoe's operated as a boarding house that provided its residents room and board, food, assistance with medication, and rides to available services. In other words, people went to Zoe's to have a place to live. Essentially all the witnesses at trial disclaimed any knowledge that any person moved there for the purpose of violating any of the relevant twenty-seven specific code sections that form a predicate act under the statute. The only conduct that fits that description is what happened after Zoe's vacated the premises. At that time, there is some evidence of persons coming onto the property to trespass, steal copper wiring, and illegally dump. These instances occurred between February 2018 up to the date of trial in early November 2018. Whether these acts reflected persons *habitually* going to the property for those purposes was a disputed question. The tenants at 8001 and 8003 Burnet testified that the problems with vagrants coming on to their property generally subsided after Zoe's left. Dr. Yee had not had any problems with persons living on the property after Zoe's left. The owner of the motorcycle shop could not identify anything that affected his business after Zoe's left.

The evidence was also disputed and supports the verdict regarding the second and third elements which blend together here: whether Burnet Holdings knowingly tolerated the situation and whether it took reasonable steps to abate the acts. The Trust focuses mainly on the timing of the steps that Burnet Holdings took, arguing that a remedial action taken long after a property owner learns of a problem is tantamount to no action at all, because it fails to fulfill the purposes

17

of Chapter 125. The argument stumbles, however, on the fact that there was conflicting evidence which a reasonable jury could have resolved against the Trust.

Two different time periods are relevant here. The first runs from when Burnet Holdings was notified of issues with Zoe's residents up to the time Zoe's vacated the property (September 2016 to February 2018). During that time, John Nelson, the property manager of Burnet Holdings, met with Sergeant Monroe with the City of Austin police department. Sergeant Monroe highlighted five specific incidents to Nelson and suggested that Burnet Holdings evict Zoe's. Nelson inquired whether any of the incidents led to actual arrests or convictions, or whether they were just reports. Monroe could not answer that question. Nelson later followed up with Monroe with the same question, but again got no response. After meeting with Monroe, Nelson went directly to Zoe's and spoke with an on-site manager about the situation, and later met with its owner about ground rules that might help the situation. And after meeting with Monroe, Nelson testified that he received no further reports of criminal activity on the property. After receiving the lawsuit, Nelson met with the owner of Zoe's. He had also started the process to evict Zoe's in October 2017, but deferred that action when Zoe's remedied its non-monetary breach of the lease. Soon thereafter, Nelson learned that Zoe's intended to vacate the property at the end of January 2018 under an agreement with the Trust.

The second relevant time frame runs from Zoe's departure until the date of trial (January 2018 to November 2018). Within the first few weeks, Nelson boarded up several broken windows. During this same time period, he had picked up nine dumpster loads of trash. He also installed an alarm system. Within the first few months, and after learning of additional broken out windows, he boarded up all the windows. Nelson testified that this "dramatically" cut down on the number of people breaking into the building. He additionally built temporary barriers to prevent access to

18

alcoves around the building. Sometime before September 2018, he installed a temporary fence to prevent illegal dumping. While some persons were able to open the temporary fencing, Nelson testified that the fence had cut down on illegal dumping. He also hauled off trash when it was dumped on the property.

Nelson or his employees chased people out of the building when they encountered them and called the police to report unauthorized access to the property. Burnet Holdings apprehended a man attempting to steal wire from the building and insisted that the police prosecute the person for felony theft. Finally, Burnet Holdings installed no trespassing signs. Despite these efforts, Burnet Holdings conceded that it was still having some issues with dumping and trespassers, but it felt the only other step was to have a tenant in the building. The injunction being sought in this lawsuit, however, made it impossible to find a new tenant.

We find legally sufficient evidence to support the jury's verdict, and by necessity do not find that the Trust proved the existence of a public nuisance as a matter of law. It failed to show that persons came onto 8007 Burnet for the purpose of committing any of the proscribed acts, much less that persons habitually did so. Finally, Burnet Holdings undertook some actions in an attempt to remedy the issues at the property and sequentially did so in a manner that a jury could have found as reasonable. Under Chapter 125, a party maintains a common nuisance only if it "fails to make reasonable *attempts* to abate the [criminal] activity[.]" (emphasis added). TEX.CIV.PRAC.& REM.CODE ANN. § 125.0015. "The plain language of the statute places the focus of the inquiry on what efforts the defending parties took, as opposed to the ultimate success or failure of those attempts." *Kim*, 451 S.W.3d at 562. We find multiple record references to several attempts to deal with the thefts and trespassers at the property.

19

By the same token we find factually sufficient evidence to support the jury's verdict. Two of the three elements that the Trust needed to prove contain terms that lean heavily on a jury's subjective view of what society tolerates. The Trust needed to prove that persons *habitually* went onto the property for an improper purpose and Burnet Holdings failed to make *reasonable* steps to abate the acts. Those terms do not portend objective measures against which we could test the evidence. The jury's negative findings are not manifestly unjust nor do they shock the conscience or clearly demonstrate bias. *Golden Eagle Archery*, 116 S.W.3d at 761. Even the second element that asked whether Burnet Holdings "knowingly" tolerated the situation turns in large part on Nelson's credibility, and his claim that after his interventional steps, the situation seemed to lessen or resolve itself. We defer to a jury's determinations on credibility and demeanor.

The Trust fervently argues that in reviewing the evidence, we cannot let a hyper-technical application of the statute undermine its remedial effect. But we take statutes as we find them, and here, the legislature imposed a requirement that persons must come onto the property for the purpose of committing a specified act, and also only required a property owner to make reasonable attempts to remedy the activity. It is not our province to rewrite the statute. We accordingly overrule Issues Three and Four.

**C. Does the Jury or Court Decide the Amount of Attorney's Fees?**

"Texas has long adhered to the American Rule with respect to awards of attorney's fees, which prohibits the recovery of attorney's fees from an opposing party in legal proceedings unless authorized by statute or contract." *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013). Here, we deal with a statutory exception as Chapter 125 includes a "loser pay" provision that reads:

> (d) In an action brought under this chapter, the court may award a prevailing party reasonable attorney's fees in addition to costs. In determining the amount of attorney's fees, the court shall consider:
>     (1) the time and labor involved;

(2) the novelty and difficulty of the questions;

(3) the expertise, reputation, and ability of the attorney; and

(4) any other factor considered relevant by the court.

TEX.CIV.PRAC.& REM.CODE ANN. § 125.003.

In anticipation of applying that provision, the trial court submitted jury questions to determine the amount of both parties' attorney's fees. Both parties put on evidence of their respective attorney's fees. Because attorney's fees were only recoverable for the statutory nuisance claim--which had been added to the case late in the game--both parties made some effort to segregate their fees into those recoverable and those not recoverable. But both parties claimed that most of their time attributable to the common law nuisance claim was intertwined with the statutory nuisance claim and was thus recoverable. The jury found that Burnet Holdings incurred $41,359.50 in reasonable attorney's fees through trial, with additional amounts for successive stages of any appeal.

Burnet Holdings, however, later filed a motion to enter judgment which asked the trial court to determine the amount of its fees. The motion argued that because the statute provides that the "the court" may award the fee, and "the court" shall consider the certain factors, only the trial court could determine the amount of attorney's fees. The motion was further supported by the attorney's affidavit, billing memos, and supplemental hearing testimony claiming a fee award of $122,482.50, along with additional contingent fees on appeal. The trial court agreed with Burnet Holdings and granted it the full amount of the fees it sought.

The Trust asks that we reform the judgment to substitute the amount of fees as found by the jury. It asks that we do so as a matter of statutory construction in applying Section 125.003, or alternatively, that we use the amount of the jury verdict as the benchmark for the only reasonable

21

amount of fees that could be awarded.[10] The central focus of the Trust's argument, however, turns on construction of Section 125.003.

        1) *Standard of Review.*

        Statutory construction is a legal question that we review *de novo. Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Our primary focus in statutory interpretation is to give effect to legislative intent, considering the language of the statute, as well as its legislative history, the objective sought, and the consequences that would flow from alternate constructions. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 383 (Tex. 2000). We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006); *see also Bosque Disposal Sys., LLC v. Parker Cty. Appraisal Dist.*, 555 S.W.3d 92, 94 (Tex. 2018) (noting "the Legislature expresses its intent by the words it enacts and declares to be the law."); *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("[t]he text is the alpha and the omega of the interpretive process."). We consider the words in context, and not in isolation. *In re Office of the Atty. Gen. of Texas*, 456 S.W.3d 153, 155 (Tex. 2015) ("Given the enormous power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases"). We must presume that every word in a statute has been used for a purpose and that every word excluded was excluded for a purpose. *Emeritus Corporation v. Blanco*, 355 S.W.3d 270, 276 (Tex.App.--El Paso 2011, pet. denied).

---

[10] The Trust in effect asks for a remittitur, but expressly asks that we *not* remand for a new fact-finding on the amount of fees. A classic remittitur, however, is based on the factual insufficiency of the evidence. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987). If we modified the judgment to include a different damage amount, we could only do so if the evidence established that new amount as a matter of law. *See Coldwell Banker Whiteside Associates v. Ryan Eq. Partners, Ltd.*, 181 S.W.3d 879, 893 (Tex. App.--Dallas 2006, no pet.) (and cases cited therein). Given the segregation issues, and the amount of time that may or may not be intertwined between recoverable and non-recoverable claims, the amount of fees is not a sum we could determine as a matter of law.

2) *Application.*

As noted, Texas follows the American Rule under which each party pays their own attorney's fees unless a statute or contract dictates otherwise. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding). And "[w]hen fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019).

Our question here is who determines what is reasonable. "In general, the reasonableness of statutory attorney's fees is a jury question." *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 367 (Tex. 2000). By the same token, "[a]ny award of fees is limited by the wording of the statute or contract that creates an exception to the American Rule." *JCB, Inc. v. Horsburgh & Scott Co.*, No. 18-1099, 2019 WL 2406971, at *8 (Tex. June 7, 2019). The Texas legislature has abrogated the American Rule in any number of contexts. Sometimes, it simply says that attorney's fees are recoverable without specifying who determines the amount.[11] Sometimes the legislature has very explicitly assigned the trial court the task of determining the amount of attorney's fees.[12] Sometimes it has assigned that duty to the fact finder.[13] Other statutes allow attorney's fees as an

---

[11] *See* TEX.PROP.CODE ANN. § 70.008 (court may award fees to prevailing party in suit over possession of motor vehicles and water craft without stating how amount determined); TEX.CIV.PRAC.& REM.CODE ANN. § 134.005 (same under Texas Theft Liability Act); TEX.GOV'T CODE ANN. § 2253.074 (same on claim on payment bond).

[12] *See* TEX.UTIL.CODE ANN. § 15.003(b) (in PUC related proceedings "[t]he court shall set the amount of attorney's fees awarded under Subsection (a)); TEX.WATER CODE ANN. § 13.382 (in water rate and service disputes "[t]he amount of the attorney's fees shall be fixed by the court."); TEX.INS.CODE ANN. § 541.159 (for offer of settlement determination, "the court shall determine reasonable and necessary attorney's fees to compensate the claimant for attorney's fees incurred before the date and time the rejected settlement offer was made.").

[13] *See* TEX.INS.CODE ANN. § 542A.007 (court shall award reasonable and necessary attorney's fees "determined by the trier of fact").

element of court costs.[14]  And like here, the legislature sometimes provides that the court awards

the fees and in doing so, the court should consider specific factors.[15]

Citing the Texas Supreme Court's recent decision in *Rohrmoos*, the Trust urges that the

default mode should always favor a jury determination of what fees are reasonable and necessary.

*Rohrmoos*, however, set the standard for determining the amount of reasonable attorney's fees that

were recoverable under a contract, and not under a statutory provision.  But other cases have

favored the jury as the fact finder for the amount of reasonable attorney's fees when the statute

does not clearly provide otherwise.  *City of Garland*, 22 S.W.3d at 367-68 (under Texas Public

Information Act, the trial judge decides whether to award fees, but a jury decides the amount);

*Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (holding that jury determines reasonableness

of attorney's fees under Texas Declaratory Judgment Act, while the court determines whether they

should be awarded at all).

Burnet Holdings, however, points out that unlike the statutes at issue in *City of Garland*

and *Bocquet*, the statute here provides that the trial court decides both whether to award fees, and

then dictates what the trial court should consider in setting the amount of the fee.  In that regard,

we focus on the Texas Supreme Court's decision in *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211,

230-32 (Tex. 2010).  One issue in *Crump* was whether the court or a jury should determine the

amount of attorney's fees awarded under TEX.LABOR CODE ANN. § 408.221(c).  That provision

allows an injured worker to recover attorney's fees when a worker's compensation insurance

---

[14] *See* TEX.LABOR CODE ANN. § 21.259 (in discrimination action, allowing prevailing party reasonable attorney's fees "as a part of the costs").  That language allows the trial court to make the award.  *See Union Pac. R.R. Co. v. Loa*, 153 S.W.3d 162, 173-74 (Tex.App.--El Paso 2004, no pet.).

[15] TEX.PROP.CODE ANN. § 5.006 (for breach of restrictive covenants, providing that court shall allow prevailing party attorney's fees based on four factors that the "court shall consider"); TEX.CIV.PRAC.& REM.CODE ANN. § 26.003 (in class litigation, requiring that trial court use Lodestar method to calculate the fee).

carrier appeals from an administrative ruling and then loses at the trial court. Similar to the statute at issue here, Section 408.221 provides that the court must approve any attorney's fee. *Id.* § 408.221(a). Any approved attorney's fee must be based on "written evidence presented to the . . . court." *Id.* 408.221(b). And "[i]n approving an attorney's fee under this section, the . . . court shall consider" a number of specified factors. *Id.* § 408.221. But conversely, the *Crump* court found some play in the statute which in turn raised an ambiguity over who decides the amount of a reasonable fee. One provision, for instance, specifically states that the court would decide issues of apportionment between recoverable and unrecoverable fees when the insurance carrier appeals on multiple issues, and prevails on some, but not all issues. *Id.* § 408.221(c). That language would be redundant, however, if only the court were to decide all attorney's fees issues. Given that both parties had raised a plausible construction of the statute supporting their view, the court held that an insurance carrier is entitled to have a jury determine the disputed amount of reasonable and necessary attorney's fees for which it is liable under Section 408.221(c). *Crump*, 330 S.W.3d at 230-32.

Our problem here is that the Trust cannot construct any similar ambiguity in Section 125.003. At most, it claims that the word "reasonable" creates an ambiguity. But the word reasonable in this statute is used to define the amount of the fee award, and not who decides the amount of the fee. We are left only with the plain language of the statute that commits to the trial court both the question of entitlement to fees, and the criteria for awarding fees. And absent that ambiguity, we are constrained to agree that the trial court decides the reasonableness question.

In its reply brief, the Trust suggests that we must construe the statute to allow for a jury trial, else we render the statute violative of the right to a jury trial guaranteed under the Texas Constitution. The Texas Constitution contains two separate provisions addressing the right of trial

25

by jury.  *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 291 (Tex. 1975) (setting out the text and history of Article I, Section 15 and Article V, Section 10).  The Trust, however, did not raise below any constitutional challenge to Chapter 125.  Constitutional challenges not expressly presented to the trial court by written motion, answer, or other response cannot be considered by the appellate courts as grounds for reversal.  *See City of San Antonio v. Schautteet*, 706 S.W.2d 103, 104 (Tex. 1986) (stating that court of appeals should not have addressed an open courts constitutional challenge raised for the first time in a reply brief filed on appeal).

Additionally, as a rule of statutory construction, a court "should, if possible, interpret [a] statute in a manner that avoids constitutional infirmity."  *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998); *see also In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011) ("When construing statutes we presume the Legislature intended them to comply with the Texas Constitution.").  But these are construction aides which would only be called upon to help resolve ambiguities in the statute.  Because we find no ambiguity, we overrule Issue Two as it relates how Section 125.003 operates.

We also decline the Trust's alternative suggestion that the jury's finding of $41,359.50 is the only correct sum under the evidence.  Burnet Holdings presented billing memos, trial testimony, and affidavit proof that supports the fee award.  Of particular note, the Trust's own lawyers argued at trial for an attorney's fee of $116,000, based on similar hourly rates and a similar theory of how the private and public nuisance claims were intertwined.  To the extent that the Trust is asking for remittitur, or that we find the lesser sum as matter of law, we decline to do so.[16]

---

[16] No issue is raised that the submission of the question to the jury estopps Burnet Holdings from later asking the trial court to decide the amount of the fee, and we express no opinion on whether a waiver or estoppel claim might or might not apply to this fact pattern.

## CONCLUSION

We overrule the Trust's four issues on appeal, and affirm the judgment below, and in addition enter judgment on the conditional attorney's fees found by the trial court for a successful appeal to the court of appeals.

JEFF ALLEY, Chief Justice

January 22, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.